## JOHN BENE & SONS, Inc., v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Second Circuit.  May 8, 1924.)

1. **Trade-marks and trade-names and unfair competition ⬤⟳80½, New, vol. 8A Key-No. Series—Court must inquire whether Trade Commission's findings supported by evidence.**

   On petition to review order of Federal Trade Commission, court must inquire whether Commission's findings of fact are supported by evidence.

2. **Trade-marks and trade-names and unfair competition ⬤⟳80½, New, vol. 8A Key-No. Series—Testimony, though legally incompetent, may be received by Federal Trade Commission.**

   Evidence or testimony, even though legally incompetent, if of kind that usually affects fair-minded men in conduct of their daily and more important affairs, should be received and considered by Federal Trade Commission, but it should be fairly done.

3. **Trade-marks and trade-names and unfair competition ⬤⟳80½, New, vol. 8A Key-No. Series—Proceeding by Federal Trade Commission must be in interest of public.**

   Under Federal Trade Commission Act, § 5 (Comp. St. § 8836e), no complaint can issue from Federal Trade Commission, unless person complained of is using unfair method of competition in commerce, and a proceeding by Commission in respect thereof would be "to the interest of the public."

4. **Trade-marks and trade-names and unfair competition ⬤⟳67—Public had no interest in protecting misbranded product of varying composition.**

   The public had no interest in production of an antiseptic of varying composition and misbranded, in that the public was by its label requested to use it for purposes for which it was medically unfit, and Federal Trade Commission should not have granted any relief to its owner against unfair competition by another, under Federal Trade Commission Act, § 5 (Comp. St. § 8836e).

Petition to Review Order of the Federal Trade Commission.

Petition by John Bene & Sons, Inc., to review an order of the Federal Trade Commission, entered December 27, 1922.  Order reversed.

Petitioner (hereinafter called Bene) is, and was in 1918, engaged, among other things, in the manufacture and sale of hydrogen peroxide.  At the same time one Proper was making and selling a compound to which he gave the trade-name of Daxol.  Among the customers of Bene were certain store systems commonly known as chain stores, and the same chain stores, or some of them, had purchased some Daxol.

In the autumn of 1918 Bene obtained a bottle purporting to contain Daxol, and submitted it for analysis to a well-known independent laboratory in New York City.  The result was not favorable to Daxol, and Bene communicated the same (in the language of the findings) "to the principal officers of * * * four large chain stores."  In the month of December petitioner submitted Daxol to another and different independent laboratory, and again the result of the analysis was not, to say the least, a favorable advertisement for Proper's compound.  This analysis Bene sent (according to the findings) to one chain store manager, accompanied by a letter substantially advising the recipient to confirm the result of the analysis, and the comment of the letter, "by asking any chemist or doctor."

In April, 1920, the Commission issued a complaint alleging that the analyses aforesaid and Bene's comment upon them "contained certain false and misleading statements and representations concerning [Daxol]; that among such false and misleading statements [is the representation that Daxol] contained lime, and that the use of [Daxol] on the human body would be attended with

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

great danger." Bene answered promptly, averring, inter alia, that the analysis was correct, and that the label upon Daxol was "absolutely false, fraudulent, and misleading."

Testimony on this issue was taken in September, 1921, and on December 27, 1922, findings were made to the effect:

(1) As the result of the analyses circulated by Bene, the chain store systems known as Kresge, McCrory, Kress, and Woolworth withdrew from sale in their stores the preparation known as Daxol, and shortly thereafter ceased to purchase the same.

(2) The analyses aforesaid and petitioner's comment thereon misled the customers of Proper into the belief that Daxol contained lime; that the use of the same on the human body would be attended with great danger; that Daxol was a weak solution, and lost its effectiveness in about 72 hours.

(3) The truth of the matter is that Daxol contains either no lime, or lime ' in such small quantities as to be entirely innocuous, and its use on the human body would not be attended with great danger, and that Daxol is not a weak solution of bleaching powder, and does not lose its effectiveness in 72 hours.

(4) That the statement of Bene concerning a competitive product, to wit, Daxol, that its use on the human body would be attended with great danger, is false, and that the statement of the analyses to the effect that Daxol is a solution of calcium hypochlorite, commonly known as bleaching powder, is misleading, deceptive, and constitutes a misrepresentation.

Immediately on making these findings the order under review was entered. The order is as follows:

"It is ordered that the respondent, John Bene & Sons, Inc., its officers, agents, representatives, and employees, do cease and desist from directly or indirectly publishing, circulating, or causing to be published or circulated, any false, deceptive, or misleading statements of or concerning the product of a competitor, and particularly from publishing, circulating, or causing to be published or circulated, directly or indirectly, such statements concerning the product 'Daxol' manufactured by the Proper Antiseptic Laboratories of Cincinnati, Ohio, to wit: That 'this is a solution of calcium hypochlorite, or, as it is usually known, bleaching powder. It is our opinion that its use on the human body would be attended with great danger.' That 'Daxol' is a very weak solution of bleaching powder and loses its effect in about 72 hours."

Petition for review followed.

Frederick N. Van Zandt, of New York City (James H. Marsh, of New York City, of counsel), for petitioner.

W. A. Sweet, of New York City, and W. H. Fuller, of McAlester, Okl., for Federal Trade Commission.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Under the Curtis Publishing Co. Case, 260 U. S. 568, 43 Sup. Ct. 210, 67 L. Ed. 408, we "must inquire whether the Commission's findings of fact are supported by evidence," and this inquiry includes an ascertainment of what kind of evidence, or evidence so called, the fact-findings rest upon. If by evidence is meant testimonial matter legally competent, relevant, pertinent, and material, this record contains very little of that kind.

It was plainly desirable, as Bene manufactured hydrogen peroxide, to compare Daxol with the other preparation, and on this point one Irene Kuhlman replied, in answer to the question "What are Daxol and peroxide used for?" thus, "Well, not a serious wound of any kind; it is very injurious to a serious wound; for cuts, very small cuts, or

bruises, or sore throat, it was very helpful, the same as could be considered as to peroxide." How competent this witness was to answer this question over due objection is perhaps suggested by the fact that her usual and regular occupation was that of running a "beauty parlor."

It also seemed appropriate to show that the business of the proprietors of Daxol had been injured by what Bene had done, and how such injury had arisen, and Miss Kuhlman testified fully on this point. Her qualifications for giving such testimony were that on the 6th of January, 1920, she became connected with the corporation that succeeded Proper in the manufacture of Daxol. At this time she became a stockholder to the extent of one share, and a director, and she also, in her own language "operated the books of the company." After thus qualifying, she testified at length concerning events that had occurred long before her connection with the concern. The scheme of her evidence may be judged from this question and answer:

"Q. Do you remember when this trouble arose about this analysis? A. I was not connected with the company, but at the time they incorporated the whole case was explained, and I have all the papers concerning the case."

She was permitted to testify, not only as to correspondence antedating her connection with Proper's successor, but as to the contents of books which were never produced. This evidence related to sales made by Proper, individually, prior to the time when (again in the witness's language) he "sold out as an individual and changed it to a corporation."

It was further necessary, under the issue as framed, to prove the inaccuracy or falsity of the analyses made at Bene's request, and this was sought to be done by introducing the investigations of other chemists. Accordingly there was offered in evidence a report on Daxol, made in February, 1919, by the chemist of the dairy and food department of the state of Ohio, one made by the Bureau of Chemistry of the United States Department of Agriculture in November, 1919, and one made in September, 1921, by Pitkin, Inc., of New York City.

Apparently no effort was made to identify or ascertain the origin of the substance submitted for analysis, further than that it was contained in a bottle labeled Daxol. The inference is necessarily that the Commission regarded the content of any bottle labeled Daxol as material to this issue, and it must also have been assumed that everything in a bottle labeled Daxol came from Proper. But there was no identification of what was analyzed as being Proper's product. On the assumptions made, and without any evidence as to the age of the preparation as analyzed, the inferences are irresistible either that the preparation known as Daxol was not stable, or that its composition varied.

The taking of opinion evidence extends over a field hitherto, we think, unknown in legal investigation. One of the chemists who had analyzed the contents of a Daxol bottle at the request of Bene had said that its use "on the human body would be attended with great danger." Whereupon another chemist was asked by the Commission's attorney whether he thought Daxol would be injurious when applied to the human body. Over objection he was permitted to testify on the ground that, "Well, it was a chemist that made that statement; that's

the reason I think that he (the witness) is qualified." And examples of similar procedure might be multiplied.

The questions suggested by the foregoing references are whether the Commission, in its investigations, is restricted to the taking of legally competent and relevant testimony. We incline to think that it is not by the statute, and, having regard to the exigencies of administrative law, that it should not be so restricted.

[2] We are of opinion that evidence or testimony, even though legally incompetent, if of the kind that usually affects fair-minded men in the conduct of their daily and more important affairs, should be received and considered; but it should be fairly done. The Trade Commission, like many other modern administrative legal experiments, is called upon simultaneously to enact the rôles of complainant, jury, judge, and counsel. This multiple impersonation is difficult, and the maintenance of fairness perhaps not easy; but we regard the methods pursued in showing Proper's diminution in sales as lacking in every evidential or testimonial element of value, and opposed to that sense of fairness which is almost instinctive.

We note that no finding of fact was made by the Commission to the effect that Proper's sales of Daxol in the aggregate diminished; but a finding was made ut supra that four chain store systems excluded Daxol from their counters. As to this finding the record contains no evidence whatever justifying any reference to the Woolworth Company. The agent of Kresge testified plainly that Daxol did not sell, and that that was the reason "we discontinued carrying it." The buyer for McCrory declared that the chemical analysis would have had no effect on him, if there had been a large trade in Daxol, and averred that the reason why he did not continue buying it was because the demand slackened. The witness produced from the Kress Company was the only support of the Commission's substantial averment, namely, that these particular four chain stores dropped Daxol as a result of Bene's activities.

We cannot think that such testimony as this affords a foundation, either legal or reasonable, for the finding first above summarized. Having pointed out the infirmity of what was introduced as evidence, we shall not pause to inquire as to whether the order could be justified on all that is left of any probative value, to wit, the statement on behalf of the Kress Company, the various analyses, the admissions of the petitioner herein; for there is a much more important question presented by this record.

[3] This proceeding has nothing to do with the various anti-trust acts. The only statute invoked is section 5 of the act creating the Commission. 38 Stat. 717–724 (Comp. St. § 8836e). Under this statute there are two points that must be made to appear before any complaint can issue: (1) That the person complained of "is using any unfair method of competition in commerce"; and (2) that a proceeding by the Commission in respect thereof would be "to the interest of the public."[1]

It would seem elementary that whatever is necessary to justify a

---

[1] See a discussion of this point by Denison, J., in Silver v. F. T. C. (C. C. A.) 289 Fed. 985.

proceeding by the Commission must be .proved in that 'proceeding by said Commission. Both these points are duly alleged in the complaint herein, but no finding has been made to the effect that the proceeding has been justified as being in the interest of the public. That the public interest is to be considered in proceedings of this kind is manifest from all the reports. But it is sufficient to cite,the Winsted Hosiery Case, 258 U. S. 483, 42 Sup. Ct. 384, 66 L. Ed. 729. The court said, at page 493 (42 Sup. Ct. 385):

"The facts show that it is to the interest of the public that a proceeding to stop the practice be brought. * * * When misbranded goods attract customers by means of the fraud which they perpetrate, trade is diverted from the producer of truthfully marked goods."

The decision cited rests flatly on the proposition that the goods there complained of were misbranded, and therefore afforded an unfair method of competition with goods properly branded. But what the court said concerning the goods advertised under a name deemed to contain improper and indeed fraudulent implications is just as applicable to goods sought to be protected and the sale thereof advanced through a proceeding by the Trade Commission, but for the benefit and advantage primarily of a complainant; in this case a single person, the manufacturer of Daxol.

The real meaning of this litigation is perfectly shown by the witness Kuhlman, who, after testifying that sales of Daxol had practically ceased at the time she testified, volunteered the statement that:

"The concerns to whom we have been selling this product have had no faith up to this time because of the analysis that has been forwarded to the different companies. If the decision is in our favor, we may be able to reinstate their faith in the product."

An objection by petitioner to this declaration was overruled, and the statement stands as a peculiarly frank exposition of the nature and purpose of the proceeding. We shall therefore consider, in the absence of any finding on the subject, whether it is true, as alleged in the answer, that what is imparted to the public by the label on the Daxol container is "false, fraudulent, and misleading."

The label on a Daxol bottle declares that it is a "new American antiseptic, stronger than peroxide." It is said to represent "the highest chemical skill in producing a most potent antiseptic, similar to the one in use 'at hospitals, at the European fronts, and recognized to be the greatest medical discovery of the age." In a special note the public is recommended: "To obtain the best results, use Daxol as often as possible." The directions for using this "potent antiseptic" are in part as follows:

"For cuts, open wounds, and ulcers, moisten thoroughly on lint or cotton and apply freely. For sore throat, gargle every half hour. For abscesses and boils, apply freely by moistening cotton. For sore and inflamed eyes, mix one teaspoonful to two tablespoons warm water and bathe eye."

And there are other directions of a similar nature too long to quote. Of the five analyses offered in evidence, all but one report·lime as present in varying proportions, and the one that does not mention lime

does not pretend to be fully quantitative. This analysis, put in evidence by the Commission, concludes thus:

"Product is principally chlorine water of a strength of .06 per cent. As a disinfectant, free chlorine is only equal to hydrogen peroxide, so, to be as strong, this solution should be 3 per cent. Misbranded. Statement on label is false."

So far as chlorine is concerned, the proportions of that chemical found in the samples submitted vary enormously, viz. from .11 per cent. to .058 per cent.; while as for calcium hypochlorite (bleaching powder) it is present in a majority of the specimens submitted. The record contains no attack upon the accuracy of the several analyses. It follows necessarily that we have here a compound either chemically unstable, which is a point no chemist testified upon, or varying in composition, which is a point any layman can ascertain and understand from the evidence herein.

Finally, the record contains no contradiction of the evidence given from a highly qualified physician and surgeon, who testified from all the analyses, and his own experience with disinfectants and antiseptics. This uncontradicted and unimpeached witness went through the label from which we have quoted above, and pointed out that most of the purposes for which the proprietor so highly recommended Daxol meant the free application of this solution to mucous membrane both healthy and diseased. He gave it as his professional opinion that such applications of Daxol would invariably produce "an irritating caustic effect," and he heartily agreed with the Ohio food department that Daxol was a misbranded article.

[4] From this evidence we deduce as findings of fact:

First. Daxol is a product of varying composition, and misbranded, in that the public is by its label requested to use it for purposes for which it is medically unfit.

Second. The public has no interest in the protection of such an article.

As a conclusion of law, we hold that, there being no proof of a public interest herein, or of its being to the interest of the public that this proceeding should have been begun, or the order complained of made, said order must be reversed; and it is reversed accordingly.