OPP COTTON MILLS, INC., ET AL. *v.* ADMINISTRA-
TOR OF THE WAGE AND HOUR DIVISION OF
THE DEPARTMENT OF LABOR.

No. 330. Argued December 20, 1940.—Decided February 3, 1941.

128

Mr. *Ben F. Cameron,* with whom *Mr. W. Gordon Mc-Kelvey* was on the brief, for petitioners.

130

132

*Solicitor General Biddle,* with whom *Messrs. Robert L. Stern, George A. McNulty, Warner W. Gardner, Gerard D. Reilly, Irving J. Levy, Rufus G. Poole,* and *Louis Sherman* were on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Three types of questions are presented by the petition for certiorari in this case:

*First,* whether the Fair Labor Standards Act of 1938, 52 Stat. 1060, is authorized by the Commerce Clause, violates the Tenth Amendment and the Due Process Clause of the Fifth Amendment and is an unconstitutional delegation of the legislative power of Congress to the Administrator of the Wage and Hour Division of the Department of Labor, appointed pursuant to § 4 (a) of the Act.

*Second,* whether an order of the Administrator prescribing a minimum wage in an industry is unauthorized by the statute and invalid because the procedure of the Administrator and an Industry Committee appointed by him pursuant to § 5 of the Act, which resulted in the order, is unauthorized and violates the Fifth Amendment.

*Third,* whether the order of the Administrator is invalid because his findings on which the order is based are without the support of substantial evidence. The challenged findings are that the minimum wage established by the order will not substantially curtail employment, and that a classification within the industry is unnecessary for the purpose of fixing, for each classification within it, the highest minimum wage which will not substantially curtail employment in such classification and will not give any competitive advantage to any group in the industry.

Petitioner, Opp Cotton Mills, Inc., an Alabama corporation subject to the Fair Labor Standards Act, alleging that it was aggrieved by an order of respondent, the Administrator, brought the present proceeding in the Circuit Court of Appeals for the Fifth Circuit pursuant to § 10 of the Act, to review and set aside the order fixing a uniform 32½ cents per hour minimum wage for the textile industry, and for other relief. So far as now relevant petitioners challenged the validity of the Act and the order upon the grounds already mentioned. The Court of Appeals sustained the order. 111 F. 2d 23. We granted certiorari, 311 U. S. 631, on a petition raising the same questions concerning the validity of the order, which we deem of public importance in the administration of the Act.

The general scope of the Act and the provisions of § 15 (a) (1) (2) and (5) and §§ 6 and 7, prohibiting the manufacture for and shipment in interstate commerce of goods produced for the commerce by employees employed at less than the prescribed minimum wage or more than the prescribed maximum hours without payment of the required overtime wage, have been discussed in *United States* v. *Darby, ante,* p. 100. It is unnecessary to repeat that discussion here.

We are here concerned with § 5 (a), § 6 (a) (4), and § 8, under which the proceedings were had which resulted in the challenged order of the Administrator. These sections read together set up an administrative procedure for establishing a minimum wage in particular industries greater than the statutory minimum prescribed by § 6, but not in excess of 40 cents an hour, such increase over the statutory minimum to be fixed for any industry subject to the Act by the Administrator in collaboration with an industry committee.

Section 5 provides, subsection (a), that the Administrator shall appoint an industry committee for each in-

dustry engaged in interstate commerce or in the production of goods for the commerce; that, subsection (b), the committee shall include persons representing the public, one of whom shall be designated as chairman, a like number representing employees in the industry, a like number representing employers in the industry, and directs that "In the appointment of the persons representing each group, the Administrator shall give due regard to the geographical regions in which the industry is carried on"; that, subsection (d), the Administrator shall submit to the committee from time to time available data on matters referred to it, shall cause to be brought before the committee in connection with such matters any witnesses whom he deems material, and that the committee may summon other witnesses or call upon the Administrator to furnish additional information to aid it in its deliberations.

Section 6 (a) (4) provides that at any time after the effective date of the section the minimum wage shall be "not less than the rate (not in excess of 40 cents an hour) prescribed in the applicable order of the Administrator issued under section 8." Section 8 (a) prescribes the procedure to be followed by the Administrator and industry committee in establishing the minimum wage authorized by § 6 (a) (4). It provides that with the view to carrying out the policy of the Act "by reaching, as rapidly as is economically feasible without substantially curtailing employment, the objective of a universal minimum wage of 40 cents an hour in each industry" subject to the Act, the Administrator "shall from time to time convene the industry committee for each such industry" which "shall . . . recommend the minimum rate or rates of wages to be paid under section 6 by employers" subject to the Act "in such industry or classifications therein."

Upon the Administrator's referring to the committee the question of minimum wage rates in an industry, § 8

(b) requires it to "investigate conditions in the industry," authorizes it or a subcommittee to "hear such witnesses and receive such evidence as may be necessary or appropriate to enable the committee to perform its duties and functions" under the Act and requires the committee to "recommend to the Administrator the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." Subsection (c) requires the committee for any industry to "recommend such reasonable classifications within any industry as it determines to be necessary for the purpose of fixing for each classification within such industry the highest minimum wage rate (not in excess of 40 cents an hour) which (1) will not substantially curtail employment in such classification and (2) will not give a competitive advantage to any group in the industry, and shall recommend for each classification in the industry the highest minimum wage rate which the committee determines will not substantially curtail employment in such classification." It further directs that "no classification shall be made, and no minimum wage rate shall be fixed, solely on a regional basis, but the industry committee and the Administrator shall consider among other relevant factors the following:

"(1) competitive conditions as affected by transportation, living, and production costs;

"(2) The wages established for work of like or comparable character by collective labor agreements negotiated between employers and employees by representatives of their own choosing; and

"(3) the wages paid for work of like or comparable character by employers who voluntarily maintain minimum-wage standards in the industry."

By § 8 (d) after the industry committee files its report with the Administrator he, "after due notice to inter-

ested persons, and giving them an opportunity to be heard, shall by order approve and carry into effect the recommendations contained in such report, if he finds that the recommendations are made in accordance with law, are supported by the evidence adduced at the hearing, and, taking into consideration the same factors as are required to be considered by the industry committee, will carry out the purposes of this section." Otherwise the Administrator is required to disapprove the recommendations of the committee and again refer the matter to the committee or to another committee for the industry which he may appoint for that purpose. Subsection (f) provides among other things that the wage orders of the Administrator "shall define the industries and classifications therein to which they are to apply" and subsection (g) provides that "due notice of any hearing provided for in the section shall be given by publication in the Federal Register and by such other means as the administrator deems reasonably calculated to give general notice to interested persons."

As appears from his findings in support of the order, the Administrator, on September 13, 1938, appointed Industry Committee No. 1 for the textile industry, that industry being so defined by the order of appointment as to include the manufacture of cotton, silk, rayon and other products. Seven persons representing the public, seven representing employers in the industry, and seven representing employees were appointed to the Committee. Upon request of the Administrator at the Committee's first meeting in October, 1938, subcommittees were appointed for the purpose of considering precisely where the line should be drawn between the textile and some related industries not included in the definition adopted. Before the Committee concluded its deliberations on the recommended wage order the Administrator modified the definition in certain respects not now material.

At a meeting in December, 1938, the Committee heard witnesses and received briefs and memoranda from numerous interested parties. Statistical and economic studies by the Bureau of Labor Statistics in the Economic Section of the Wage and Hour Division had been previously submitted. The Committee then designated another subcommittee to gather additional information and hear such testimony as it deemed necessary to enable the Committee to arrive at a wage recommendation. This subcommittee obtained further economic data and heard additional witnesses including representatives of the American Association of Cotton Manufacturers of which petitioner is a member.

On March 21, 1939, after extended discussion and deliberation, the Committee, by a vote of thirteen to six, adopted a resolution which fixed tentatively a minimum wage of 32½ cents an hour amounting to $13 per forty-hour week or $676 for 52 weeks, as the rate to be recommended to the Administrator. At this meeting the Committee rejected proposals to establish classifications in the industry and wage differentials among the classes. A subcommittee was appointed to draft a report, and on May 22nd and 23rd, after the Administrator had again modified the definition of the industry, the Committee again approved by the same vote as before the 32½ cents minimum wage. The report was accepted and signed, the minority filing two reports in opposition to the recommendation. The report detailed the proceedings of the Committee, analyzed the evidence and data upon which the Committee relied in making its recommendation, gave special consideration to the question whether the wage fixed would curtail employment in the industry generally and in the southern cotton mills in particular, and to the problem of classification. It concluded that "no reasonably efficient enterprise in the textile industry need fear the result of the modest wage standard recommended for

the industry," and that the data before it "did not warrant any regional" or other "classification."

On May 27th the Administrator gave notice in the Federal Register which was also issued to the press and published in many newspapers, of a public hearing on the recommendations of the Committee. At the hearing which commenced on June 19, 1939, and was concluded on July 11th, more than 135 witnesses were heard, over 3,300 pages of testimony were taken and eight volumes of exhibits were submitted; oral arguments were heard by the Administrator on July 25th and written briefs were received until August 22, 1939. On September 29, 1939, the Administrator made his findings and order carrying into effect the recommendations of the Committee, effective October 24, 1939, the date on which pursuant to § 6 (a) (2) a minimum wage of 30 cents per hour for all employees subject to the Act became effective.

The industry, as defined by the order, includes broadly the manufacture of yarns and fabrics of cotton and competing material such as rayon and silk, and of those finished products such as sheets, towels and napkins which are normally manufactured in the fabric weaving mills. The Administrator found that the basic considerations in determining which manufacturing processes were to be included within the definition were competitive interrelationships, convertibility of looms and the operations normally carried on by textile mills.

Although the Adminstrator was of opinion that the question of the composition of the Industry Committee was not properly before him for determination, he reviewed the evidence and concluded that the members had been chosen with due regard to the geographical regions in which the industry is carried on and that the Committee had considered the factors set forth in § 8 of the Act and had reached its recommendation in accordance with law.

The Administrator found that the 32½ cent minimum wage would increase the average wage bill for the textile industry as a whole 4 per cent over the 25 cent minimum in effect before October 24, 1939, and 2.1 per cent over the 30 cent minimum in effect thereafter and that the wage increases in the southern portion of the industry would be 6.25 per cent and 2.15 per cent over the 25 and 30 cent minimum respectively. He further found that since the average labor costs do not constitute over 36 per cent of production costs the minimum wage increase would increase production costs slightly over one-third of the percentages of wage increases just indicated, and that the increase in production costs would not result in such a rise in prices to ultimate consumers of the finished product as to decrease consumer demand.

From all this he drew the conclusion that there would be no substantial curtailment of employment in the industry as a whole or in its southern branch as a result of the increased wage. In the case of small cotton mills in the south employing only 7 per cent of the southern cotton textile workers (5 per cent of all in the entire cotton industry), paying the lowest wages, he concluded that the new minimum rate as contrasted with the 30 cent statutory rate would raise manufacturing costs more than the 1.94 per cent average, and for these mills the increase would range from 2.77 per cent to 3.75 per cent. The Adminstrator found that curtailment of employment even in the mills paying the lowest wages would be dependent on total cost and the technological and general efficiency of each mill, and that low wages do not necessarily coincide with a low degree of efficiency. The Administrator found generally that the small southern mills are not necessarily marginal or the least profitable and that, accepting the figures submitted by the group of small mills opposing the 32½ cent minimum, the increase in labor costs for such mills would be 13.5% and

only 4 per cent in total manufacturing cost over the 25 cent minimum. The increase over the 30 cent minimum would be slightly over one-third of these percentages. The Administrator also found that a modernization program in these mills would displace only a small number of employees. From these and other facts detailed in the findings, the Administrator concluded that there would be no substantial curtailment of employment even in the group of small mills.

The Administrator also considered the factors for determining whether classification should be made for wage differentials within the industry. After examining numerous studies of living costs made by the Bureau of Labor Statistics of the Department of Labor he concluded that the cost of living in the north exceeds that in the south by about 4.6% on the average, and that the differences in costs between cities in each region greatly exceed the difference between the two regions as a whole. He accordingly concluded that living costs do not vary substantially or uniformly between regions and do not affect competitive conditions in the industry. He found that northern mills had an advantage with respect to transportation costs in shipping to the New England states, but southern mills had an advantage in shipping to the middle west and south, having a great population; that many northern finishing mills receive unfinished cloth from southern factories and thus bear the disadvantage in freight rates from the south to northern finishing mills and that on an average the south has a slight transportation advantage with respect to cotton coming to the mills there. He concluded that even with the average freight rates in the south somewhat higher than the north, on the whole the advantages and disadvantages in transportation costs in the two regions were approximately in balance and that any remaining disadvantage was so small as not to affect competitive conditions appreciably.

After considering the proportion of obsolescent machinery in northern and southern mills, their taxes, efficiency of workers, power and construction costs and profits, the Administrator found that the southern mills were at least in a position of equality with northern mills in so far as these factors affect production costs, and that after the establishment of the 32½ cent minimum the prevailing minimum wages in the north would be considerably higher than in the south. He concluded that neither wage rates in collective labor agreements nor wages paid by employers maintaining voluntary minimum wage standards required a classification within the industry, and finally he concluded that the Industry Committee's recommendations "are made in accordance with law, are supported by the evidence adduced at the hearing and, taking into consideration the same factors as are required to be considered by the Industry Committee, the prescribed 32½ cent wage will carry out the purposes of § 8 of the Act."

*Constitutionality of the Act.* The objections that the sections of the Act imposing a minimum wage and maximum hours are not within the commerce power and infringe the Tenth and Fifth Amendments were discussed and disposed of in our opinion in *United States* v. *Darby, supra.* Since petitioners concede that they are engaged in the manufacture of cotton goods for interstate commerce it is unnecessary to consider these contentions further here.

There remains the question whether the Act is an unconstitutional delegation of the legislative power of Congress. Petitioners urge that the standards prescribed for fixing the authorized minimum wages between 30 and 40 cents per hour are too vague and indefinite to admit of any judicial determination whether they are within or without the standards prescribed by Congress.

It is not seriously urged that the policy and standards of the statute are subject to these criticisms independently of the provisions relating to classification. Section 8 defines, with precision, the policy of the Act to raise the minimum wage to the 40 cents per hour limit "as rapidly as economically feasible without substantially curtailing employment" in each industry, and the standards of the administrative action applicable to the Administrator are those made applicable to the committee which it is provided "shall recommend to the Administrator the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." But it is said that application of these standards in an industry is made contingent upon the determination whether the industry is to be classified and if so, whether it is to be subject to particular wage differentials, and that these determinations in turn depend upon factors so inadequately defined as to afford no standard of administrative action.

Committee and Administrator are required, as prerequisites for the classification, to determine that it will not give a competitive advantage to any group in the industry, and that the prescribed wage will not substantially curtail employment in each classification, and in making these determinations the committee and Administrator must consider "among other relevant factors," competitive conditions as affected by transportation, living and production costs, and the wage scale for comparable work established by collective bargaining labor agreements, and by employers who voluntarily maintain minimum wage standards in the industry.

It is urged that the statute does not prescribe the relative weight to be given to the specified factors or the other unnamed "relevant factors." It is said that this,

with the further requirements that the prescribed wage is to be fixed with "due regard to economic and competitive conditions"; that the classification if made shall not "give a competitive advantage to any group in the industry," and that the prescribed wage must be one fixed "without substantially curtailing employment," leave the function which the committee and Administrator are to perform so vague and indefinite as to be practically without any Congressional guide or control.

The mandate of the Constitution that all legislative powers granted "shall be vested" in Congress has never been thought to preclude Congress from resorting to the aid of administrative officers or boards as fact-finding agencies whose findings, made in conformity to previously adopted legislative standards or definitions of Congressional policy, have been made prerequisite to the operation of its statutory command. The adoption of the declared policy by Congress and its definition of the circumstances in which its command is to be effective, constitute the performance, in the constitutional sense, of the legislation function.

True, the appraisal of facts in the light of the declared policy and in conformity to prescribed legislative standards, and the inferences to be drawn by the administrative agency from the facts, so appraised, involve the exercise of judgment within the prescribed limits. But where, as in the present case, the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by the statute to be kept or which is in fact preserved, are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed, there is no failure of performance of the legislative function.

While fact finding may be and often is a step in the legislative process, the Constitution does not require that Congress should find for itself every fact upon which it bases legislation. "It is a *constitution* we are expounding" "intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, 415. In an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy in fixing, for example, a tariff rate, a railroad rate or the rate of wages to be applied in particular industries by a minimum wage law. The Constitution, viewed as a continuously operative charter of government, is not to be interpreted as demanding the impossible or the impracticable. The essentials of the legislative function are the determination of the legislative policy and its formulation as a rule of conduct. Those essentials are preserved when Congress specifies the basic conclusions of fact upon ascertainment of which, from relevant data by a designated administrative agency, it ordains that its statutory command is to be effective.

The present statute satisfies those requirements. The basic facts to be ascertained administratively are whether the prescribed wage as applied to an industry will substantially curtail employment, and whether to attain the legislative end there is need for wage differentials applicable to classes in industry. The factors to be considered in arriving at these determinations, both those specified and "other relevant factors," are those which are relevant to or have a bearing on the statutory objective. The fact that Congress accepts the administrative judgment as to the relative weights to be given to these factors in each case when that judgment in other respects

is arrived at in the manner prescribed by the statute, instead of attempting the impossible by prescribing their relative weight in advance for all cases, is no more an abandonment of the legislative function than when Congress accepts and acts legislatively upon the advice of experts as to social or economic conditions without reexamining for itself the data upon which that advice is based.

Measured by this requirement the present statute is no less an exercise of the legislative function than was the Tariff Act of 1922 authorizing the President to raise or lower tariff duties so as to equalize the difference which, with the aid of the Tariff Commission, he finds between the costs of production of dutiable articles in this and in foreign countries, his determination, to be based upon a variety of relevant factors, some specified and others not, for which the statute prescribed no relative weight. See *Hampton & Co. v. United States,* 276 U. S. 394; cf. *Norwegian Nitrogen Products Co. v. United States,* 288 U. S. 294; *United States v. Bush & Co.,* 310 U. S. 371. See to the like effect under other statutes *Interstate Commerce Comm'n v. Louisville & N. R. Co.,* 190 U. S. 273 (Interstate Commerce Act); *Mulford v. Smith,* 307 U. S. 38, 48, 49 (Agricultural Adjustment Act of 1938); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U. S. 381, 399 (Bituminous Coal Conservation Act of 1937); *Currin v. Wallace,* 306 U. S. 1 (Federal Tobacco Inspection Act); *United States v. Rock Royal Co-operative,* 307 U. S. 533 (Agricultural Marketing Agreement Act).

*The procedure before the Industry Committee.* The procedure before the Committee is assailed upon three principal grounds: that the changes in definition of the textile industry made after the appointment of the Committee rendered the order of apportionment void; that the order defining the industry is also invalid because the Administrator placed the woolen industry in a different

industry under a different committee, rather than in the textile industry including cotton, silk and rayon; and that the Committee was not properly constituted under the statute because the Administrator in selecting it did not give "due regard to the geographical regions in which the industry is carried on." Certain procedures before the Committee are also challenged because they are said to be unauthorized or contrary to the statute or to the requirements of due process.

At the outset the distinct separation of the functions to be performed by the committee under § 8 (a), (b), (c), (d), from that to be performed by the Administrator after submission of the committee's report, is to be noted. The committee is required to be composed of equal numbers of representatives of the public, of the employers and of the employees in the industry, selected with due regard to geographical considerations. It acts as an investigating body with the duty to report its recommendations to the Administrator. Its report is the basis of the proceedings before the Administrator under § 8 (d) which are judicial in character, with provisions for notice and full hearing. The issue to be determined by the Administrator upon the hearing is whether the recommendations of the committee "are made in accordance with law, are supported by the evidence adduced at the hearing, and, taking into consideration the same factors as are required to be considered by the industry committee, will carry out the purposes of this section." Review of the Administrator's order fixing a wage is had under § 10 by petition to the circuit court of appeals on the record made before the Administrator. Thus under the provisions of § 8 (d) no wage is fixed which is not recommended by the committee, and not then without appropriate hearing, findings and order by the Administrator.

As already stated the Administrator's order of September 13, 1938, setting up the Industry Committee, de-

fined the industry so as to include the manufacture of a variety of cotton, silk and rayon products, including those made by petitioners, and throughout the proceedings their products were so included. On recommendation of the Committee two changes in the definition were made with reference to the inclusion and exclusion of products which were near the borderline of the definition before the amendment. December 19, 1938, the order was amended so as to exclude knitted fabrics and to include other products such as blankets and sheets. A second amendment ordered by the Administrator on May 22, 1939, just before the Committee adopted its report, added to the Industry the manufacture of mixed products containing not more than 45 percent wool.

In all this we can find no failure to comply with the statute. Section 5 (a) directs that "the Administrator shall, as soon as practicable, appoint an industry committee for each industry" subject to the Act. But it does not direct a final definition of the industry to be made before the committee meets and such a requirement plainly would not comport with the purposes of the Act. Section 8 (f) provides that orders of the Administrator "issued under this section" which are the final orders fixing a wage "shall define the industries and classifications therein to which they are to apply." So far as the definition is open to attack, it is upon the record made before the Administrator if it there appears that the definition does not conform to the statute, or that the recommendations of the committee were based on a different definition of the industry from that finally made and so do not support an order for the industry as defined.[1] But subject to these requirements which in-

---

[1] Here the Committee reconsidered its report, after the Administrator had redefined the industry on May 22, 1939, and again adopted its recommendations which had been agreed upon.

sure that recommendations of the committee and the order of the Administrator are based on the same definition of the industry, there is no provision of the statute preventing amendment of the definition while the matter is pending before the committee and no purpose or policy of the Act which would be served by precluding such amendments so long as the report of the committee is based on the amended definition. It is to the advantage of the administration of the Act that the completeness and accuracy of the definition should be reexamined and the definition revised with the aid of the committee at any time before its report is submitted. We find nothing in the statute to prevent it.

Section 3 (h) defines "Industry" as meaning "industry, or branch thereof, or group of industries." In defining the textile industry and in fixing for it a wage which with due regard to "economic and competitive conditions" will not substantially curtail employment in the industry it was appropriate for the Administrator to take into account competitive conditions. In defining the industry the Administrator took into account the competitive interrelationship of the fabrics included and the interchangeability of the looms employed in producing them; and in excluding the woolen industry he took account of its competitive relationships with the products included and the different nature of the establishments, labor forces and wage structures associated with the two types of product. On the record before us, we cannot say that in so doing he transgressed any provision of the statute. Nor can we say that in applying these tests he departed from its purpose. The inclusion of a given product in one industry or another, where both are subject to the Act, principally concerns convenience in administering the Act. For the provisions for classification with appropriate wage differentials afford ample opportunity for fixing an appropriate

wage with respect to any product whether it is placed in one industry or another. There is no serious contention and we find no basis for saying that the evidence does not support the Administrator's order with respect to exclusion of wool from the definition of the textile industry.

We conclude also that the composition of the Committee satisfies the requirements of the Act. The Committee consisted of twenty-one persons, seven selected from each of the three groups represented. Of the employer representatives five were cotton goods manufacturers, and four of these were from the southern states. The rayon and silk manufacturers each had one representative. Since these branches of the industry are predominantly northern they were selected from the north. Three of the seven members representing the public were from southern states, one was from Pennsylvania and three from the middle west. Two of the representatives of labor were from the south, three from the north and two of them from Washington, D. C. All five of the non-southern labor members of the Committee were executive officials of or connected with labor organizations, national in scope, which represented employees in the south. Thus nine of the members of the Committee were from the south, and the Administrator could have concluded that five others fairly represented the south.

While only 31 per cent of the factories in the industry are in the south, 51.5 per cent of the value of the product is produced in southern mills and 55 per cent of the wage earners in the industry are employed by those mills. Petitioners argue that since the south had a mathematical preponderance in the Industry the Administrator was required by the statute to appoint a majority of each group, or at least a majority of the members of the Committee from that region. But the requirement of the statute that the Administrator give "due

regard" to geographical considerations is not a requirement for a mathematical geographical apportionment of the committee. It calls for the exercise of discretion by the Administrator in selecting, with the purposes of the Act in mind, a committee on which the geographically distributed interests of the Industry shall be fairly represented. As the record shows that the lowest wage scale prevailed in the southern mills, the Administrator could have concluded that a selection of a committee, a majority of whose members represented a low wage locality would tend to defeat the purposes of the Act. The Act was also intended to protect the interests of employers and employees of mills in other localities which compete with the low wage scale mills. We cannot say that the Administrator failed to give "due regard" to geographical considerations or otherwise abused his discretion in the selection of the Committee.

Petitioners make a great variety of criticisms of the proceedings before the Committee, all of which rest on the presupposition that either the statute or the demand of due process of law requires the Committee to hold hearings upon notice to interested persons and that its hearings be subject to review before the Administrator and finally as a part of the proceedings before the Administrator to judicial review on petition to the Circuit Court of Appeals, as provided by § 10.

Section 5 (c) directs that the Administrator shall "by rules and regulations prescribe the procedure to be followed by the committee." Section 5 (d), as already noted, provides that the Administrator shall submit data to the committee, shall cause witnesses whom he deems material to be brought before it, and that the committee "may summon other witnesses" to aid in its deliberations. Section 8 (b) requires the industry committee to "investigate" conditions in the industry. It provides that the committee "may hear such witnesses and re-

ceive such evidence as may be necessary or appropriate" and requires the committee to "recommend" to the Administrator the highest minimum wages "which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." After the report is filed with the Administrator he, upon due notice and hearing, is required to approve or reject the recommendations.

It is clear that the sections of the statute now before us do not require the committee to conduct a quasi-judicial proceeding upon notice and hearing. Its function, as already stated, is to investigate upon the basis of data which the Administrator may submit and which the committee may procure for itself and to report its recommendation with respect to the minimum wage. Cf. *Norwegian Nitrogen Co.* v. *United States, supra,* 318. That such is the interpretation of the statute is abundantly supported by its legislative history. See Conference Committee Report, H. Rept. No. 2738, 75th Cong., 3d Sess., p. 31, and the explanation of the bill by the Chairman of the Senate Committee, 83 Cong. Rec. 9164. In his statement he pointed out that the procedure is modeled upon the New York Minimum Wage Act, see *Morehead* v. *Tipaldo,* 298 U. S. 587, 619, and he emphasized that no minimum wage rate could be established which had not been first "carefully worked out" by a committee drawn principally from the industry itself and that it should not then be put into effect "by administrative action which has not been found to be in accordance with law by an independent, responsible administrative office of the Government, exercising an independent judgment on the evidence after a legal hearing."

The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long

as the requisite hearing is held before the final order becomes effective. The proceedings before the Administrator as provided by § 8 (d) satisfy the requirements of due process without further requirement, which the statute omits, of a hearing on notice before the Committee. *York* v. *Texas,* 137 U. S. 15; *American Surety Co.* v. *Baldwin,* 287 U. S. 156, 168; *United States* v. *Illinois Central R. Co.,* 291 U. S. 457, 463.

The command of § 8 (d) that the Administrator, as a prerequisite to a wage order, find that the recommendations of the committee "are made in accordance with law" does not extend to a review of the evidence and hearings before the committee or an investigation of the mental processes by which Committee members reached their conclusion to recommend the minimum wage, or extend beyond inquiry upon evidence before the Administrator whether the requirements of statute and rules of the Administrator as to the composition of the committee, the definition of the industry, and the actions required to be taken by the committee have been observed.

Such being the function of the committee it is immaterial that substitutes were appointed for two members in the course of its deliberations, it not appearing that they did not consider the evidence taken and the proceedings had before their appointment to the Committee.

*Procedure before the Administrator.* Notice of the hearing before the Administrator was given in conformity to the statute, and since the notice was forty days in advance of the time when petitioner's representative was heard and introduced evidence into the record and a further opportunity was given to present evidence, the contention that the notice to petitioner was inadequate or failed to meet constitutional requirements is without merit. And as the issue for determination by the Administrator in the light of the statutory require-

ments was framed by the report and recommendation of the Committee to the Administrator there was no failure to inform petitioner of the contentions made in behalf of the Government. Cf. *Morgan* v. *United States,* 298 U. S. 468; 304 U. S. 1. Nor can we find any error or want of due process in permitting the Industry Committee to appear before the Administrator by counsel and to offer evidence in support of its recommendations or in permitting members of the staff of the Wage and Hour Division to give testimony. See *Denver Union Stock Yard Co.* v. *United States,* 304 U. S. 470, 477.

*Support in the evidence of the Administrator's findings.* By § 10 review of the Administrator's order by the courts is limited to questions of law "and findings of fact by the Administrator when supported by substantial evidence shall be conclusive." Petitioners attack the Administrator's findings that the 32½ cent minimum will not substantially curtail employment and that classification of the industry is not required, on the ground that they are not supported by substantial evidence.

Since the statute required these findings to be based upon consideration of economic and competitive conditions in the industry, as affected by transportation, living and production costs, including wages, the findings rest, to a substantial degree, upon studies of statistical data with respect to these factors gathered by government agencies and published by them officially. They include publications of the Bureau of Labor Statistics, the Interstate Commerce Commission, the Federal Trade Commission, and the Economic Section of the Wage and Hour Division of the Department of Labor. The most important and the principal object of attack is Bulletin No. 663 of the Bureau of Labor Statistics entitled "Wages in Cotton Goods Manufacturing," which is a study of the economic conditions generally prevailing in the cotton textile industry and in particular of the wages of employees. The statistics gathered, if regarded as of proba-

tive force, and the inferences drawn from them by the Administrator, taken with other evidence, amply support his findings.

The argument of petitioners is not that the record contains no evidence supporting the findings but rather that this class of evidence must be ignored because not competent in a court of law. But it has long been settled that the technical rules for the exclusion of evidence applicable in jury trials do not apply to proceedings before federal administrative agencies in the absence of a statutory requirement that such rules are to be observed. *Interstate Commerce Comm'n* v. *Baird*, 194 U. S. 25, 44; *Interstate Commerce Comm'n* v. *Louisville & N. R. Co.*, 227 U. S. 88, 93; *Spiller* v. *Atchison, T. & S. F. Ry. Co.*, 253 U. S. 117; *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 288; *John Bene & Sons* v. *Federal Trade Commission*, 299 F. 468, 471. We need not consider whether this class of evidence must be excluded from proceedings in court.

Further the documents in question were received in evidence without objection. And even in a court of law if evidence of this character is admitted without objection it is to be considered and must be accorded "its natural probative effect as if it were in law admissible." *Diaz* v. *United States*, 223 U. S. 442, 450; *Rowland* v. *St. Louis & San Francisco R. Co.*, 244 U. S. 106, 108; cf. *United States* v. *Los Angeles & Salt Lake R. Co.*, 273 U. S. 299, 312.

The reliability of the data published in the Bulletin was supported before the Administrator by the testimony of some of his compilers. In the circumstances we think the Bulletin and other documents in question were evidence to be considered by the Administrator; that the weight to be given to them and the inferences to be drawn from them were for the Administrator and not the courts, and that they lend substantial support to his findings.

Further contentions that the findings, and particularly the finding that classification in the industry is unnecessary, and the subsidiary findings as to differences in transportation, living, and production costs, are unsupported by substantial evidence are addressed either to the weight and dependability of the evidence supporting the findings or to the testimony of particular witnesses or conflicting evidence on which petitioners rely. We have examined these contentions and, without further elaboration of the details of the evidence, we conclude that the Administrator's findings are supported by substantial evidence. Any different conclusion would require us to substitute our judgment of the weight of the evidence and the inferences to be drawn from it for that of the Administrator which the statute forbids.

Numerous other contentions are advanced by petitioners but they are subsidiary to those which we have already considered, or are of such slight moment as to call for no further discussion.

*Affirmed.*