**NATIONAL ASS'N OF WOOL MANUFAC-
TURERS et al. v. FLEMING, Wage
and Hour Administrator.**

No. 7714.

United States Court of Appeals for the
District of Columbia.

June 30, 1941.

John E. F. Wood, of New York City (S. Milton Simpson, of Washington, D. C., and Philip C. Scott, of New York City, on the brief), for petitioners.

Rufus G. Poole, Asst. Sol., of Washington, D. C. (Gerard D. Reilly, Sol., and Louis Sherman and Alfred E. Davidson, Attys., U. S. Department of Labor, and Robert S. Erdahl and David Cobb, all of Washington, D. C., on the brief), for respondent.

Before GRONER, Chief Justice, and VINSON and EDGERTON, Associate Justices.

VINSON, Associate Justice.

This is an action to review a wage order applicable to the woolen industry made by the Administrator of the Fair Labor Standards Act of 1938.[1] The chief issue is whether the Administrator in defining the woolen industry complied with the requirements of the Act.

The Administrator's research staff placed before him a proposed definition of the textile industry which recommended the inclusion of wool mixtures up to some point but the exact percentage was left open. After consultation with interested parties, cotton and wool manufacturers, who believed that the line of demarcation should be correlated with the wage differential between the cotton and the wool industries, the Administrator asked the advice of Industry Committee No. I (Textile). That Committee, after study by a subcommittee, recommended the appointment of a separate committee to represent the woolen industry, its members to come from the present industry committee in order that it might consider minimum wages and the line of distinction as joint problems. Whereupon the Administrator appointed 15 persons to Industry Committee IA; five members were from Committee I; there were no duplications among employer representatives. Committee IA held meetings, heard evidence, and then by a vote of 8-4 tentatively recommended a minimum wage of 36 cents. The recommendation was tentative because the jurisdiction of Committee IA and of Committee I was not finally determined. Committee IA then appointed a subcommittee to confer with a subcommittee of Committee I as to the appropriate line of demarcation. But upon reporting to their respective committees the matter reached an impasse. In a joint meeting Committee IA voted unanimously that yarns and fabrics containing any wool be subject to the tentatively set 36 cent woolen minimum wage, and Committee I voted 9-7 for the line of demarcation that was adopted under the N.I.R.A. The textile wage, other than for woolens, had been tentatively set at 32½ cents by Committee I.

Thereafter the Administrator redefined the jurisdiction of the two committees following in the main the line under the N. I. R. A. He defined the woolen industry to include:

(In respect of yarns) "(f) The manufacturing or processing of all yarns (other than carpet yarns) spun from wool or animal fiber (other than silk) in combination with cotton, silk, flax, jute or any synthetic fiber; except the manufacturing or processing on systems other than the woolen system of yarns containing not more than 45 percent by weight of wool or animal fiber (other than silk) in combination with cotton, silk, flax, jute or any synthetic fiber".

(In respect of fabrics) "(g) The manufacturing, dyeing or other finishing of the products enumerated in clauses (b), (c), (d), and (e) from wool or animal fiber (other than silk) in combination with cotton, silk, flax, jute or any synthetic fiber; except products containing not more than 25 percent by weight of wool or animal fiber (other than silk), with a margin of tolerance of 2 percent to meet the exigencies of manufacture."

The definitions for the textile industry were correlated to these.

Thereupon Committee No. IA (Woolen) objected unanimously to the definition, but

---

[1] 29 U.S.C.A. § 201 et seq. The Act has been discussed by the Supreme Court in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, and Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624, and by this court in Southern Garment Manufacturers Association v. Administrator, — App.D.C. —, 122 F.2d 622, decided June 30, 1941, and Andree & Seedman, Inc. v. Administrator, — App.D.C. —, 122 F.2d 634.

nonetheless, recommended the 36 cent wage for its products by a vote of 9-4. Committee No. I (Textile) recommended the 32½ cent wage by a vote of 13-6.

Upon these recommendations there was a hearing before a presiding officer appointed by the Administrator, and oral argument before the latter after briefs had been received. Six weeks later the Administrator issued his opinion, findings, and order which put into effect the recommendations as made.

## I. Are the Definitions Judicially Reviewable?

■ At the outset, the Administrator argues that in view of certain Supreme Court language in the Opp Cotton Mills case,[2] it is doubtful whether one can obtain a court review of a definition. "The basic facts to be ascertained administratively are whether the prescribed wage as applied to an industry will substantially curtail employment, and whether to attain the legislative end there is need for wage differentials applicable to classes in industry.[3] * * * *  *The inclusion of a given product in one industry or another, where both are subject to the Act, principally concerns convenience in administering the Act.* For the provisions for classification with appropriate wage differentials afford ample opportunity for fixing an appropriate wage with respect to any product whether it is placed in one industry or another."[4] (Ital. supplied by respondent.)

As the statement of the case reveals, the trouble in getting Committees I and IA to agree to the precise line of distinction was due to the tentative and uncertain difference in the wage rates to be recommended for competing products and the fact that they were competing products. The Cotton and Wool manufacturers stated the critical problem when they first advised the Administrator. The respondent's brief summarizes the manufacturers' position: "It was believed that the line of demarcation should be related to the extent of the differential of the rates between the two industries." What the wage rates shall be and where the lines should be drawn be-

tween related competitive products like these are questions which have to be resolved more or less at the same time. With this in mind, that related definitions achieve their chief significance in relation to the wage orders and the wage orders have their primary meaning when correlated to definitions, it is fitting to reitalicize the Supreme Court language. "The inclusion of a given product in one industry or another, where both are subject to the Act, principally concerns convenience in administering the Act. *For the provisions* for *classification* with *appropriate wage differentials* affords ample opportunity *for fixing an appropriate wage* with respect to any product *whether it is placed in one industry or another.*" (Ital. ours.) We have no doubt, then, that the definition is an inextricable part of a wage order and is judicially reviewable.

## II. Is the Administrator to Consider Competitive Conditions between Industries?

■ Competitive conditions are certainly material to related classifications. The next question is whether the Act contemplates the Administrator taking into account the competitive conditions between industries and whether in some instances at least he must do so. That his classifications within an industry will not be lightly disturbed has been pointed out in the Southern Garments case.[5] The same rule will apply here.

■ The Administrator argues that the definitions of the woolen and textile industries do not raise questions of classification under Section 8(c),[6] "since that section applies only to differentials *within an industry* subject to a particular committee's jurisdiction." (Ital. respondent's.) Inasmuch as industry is defined as an industry, or a branch of an industry, or a group of industries,[7] the words that should be italicized are "a particular committee's jurisdiction". It is clear that if one committee had existed for the woolen and textile industries, it would have had to take into account competitive conditions in making any classifications. Under section 8(d)[8] it is clear that the Administrator would have

---

[2] 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624.

[3] 312 U.S. at page 145, 61 S.Ct. at page 533, 85 L.Ed. 624.

[4] 312 U.S. at pages 149, 150, 61 S.Ct. at pages 534, 535, 85 L.Ed. 624.

[5] Southern Garment Manufacturers Asso. v. Administrator, — App.D.C. —, 122 F.2d 622.

[6] 29 U.S.C.A. § 208 (c).

[7] 29 U.S.C.A. § 203 (h).

[8] 29 U.S.C.A. § 208 (d).

had to do the same. Now while it may be possible to argue that if two committees are appointed neither will have to consider and report on the effect of competitive conditions outside of its jurisdiction (although it might be wise to do so), it is not reasonable to contend that by appointing two committees the Administrator may ignore competitive conditions between similar products in industries related as closely as are the instant ones. Otherwise by mere form the Administrator could escape the responsibility that should be his in fixing nationwide minimum wages—a responsibility comparable to the fixing of freight classifications by the Interstate Commerce Commission.

Does the Act adapt itself to this sensible interpretation? In Section 2(a) Congress finds, inter alia, that there were labor conditions in existence which constituted an unfair method of competition.[9] Section 2 (b) declares it to be the policy of the Act to correct and to eliminate as quickly as possible these conditions.[10] Section 8(a) states, "With a view to carrying out the policy of this Act [chapter] by reaching, as rapidly as is economically feasible without substantially curtailing employment," the universal minimum wage of 40 cents, the Administrator shall from time to time convene the committees and the committees shall from time to time make recommendations.[11] Economically feasible would seem to include competitive conditions. With the broad policy of this Act we see no reason to construe this general phrase to mean that everything is economically feasible which does not substantially curtail employment. Then Section 8(d) provides that the Administrator shall approve the committee recommendations if he finds certain things "taking into consideration the same factors as are required to be considered by the industry committee, will carry out the purposes of this section." As has been stated if a committee embraces more than one industry, it would have to consider competitive conditions over all of its subject matter when it made any classification, likewise, the Administrator. Now a committee with narrower jurisdiction might not be in a position to do this but the Administrator is. A consideration of the competitive conditions of the same or similar products of closely related industries (which might have been called an industry) would seem to "carry out the purposes" of Section 8. Even if this Section will not stand such a close reading certainly the general findings and declaration of policy in Section 2 can be used as background in construing the particular subsection 8(d).[12] We hold, therefore, that under the facts of this case the Administrator was under a duty to consider the competitive condition between the cotton and wool manufacturers in making a definition that draws a line of demarcation resulting in some types of yarn being made under a 32½ cent minimum and other similar yarns under a 36 cent minimum wage, and some mixed fabrics being subject to a 32½ cent wage, and others, 36.

### III. Competitive Conditions Raised by the Fabric Definition.

We consider first the fabric definition which states in substance that fabrics containing more than 25% wool are subject to a 36 cent minimum wage and that fabrics containing not more than 25% wool are subject to a 32½ cent minimum wage. Petitioners point out that the Administrator justified this line because the former fabrics are usually made in woolen mills, the latter in textile mills. Petitioners contend that the only specific evidence to this effect was in respect of blankets, but admit that, "it is a fair inference from the evidence that most of the part-wool fabrics made in cotton mills prior to the time of the hearing were in the range of percentages from 25% down." Nonetheless, petitioners assert that there is a disadvantage to the woolen mills because their production of mixed fabrics containing 25% or less wool will be made of yarns which fall within the woolen industry (36 cents) while such fabrics made in the cotton mills will be made of yarns which fall within the cotton industry (32½ cents). This argument really goes to the merit of the yarn definition. Hence in looking to the separate fabric making branch of the industries we see no

---

9 29 U.S.C.A. § 202 (a).

10 29 U.S.C.A. § 202 (b).

11 29 U.S.C.A. § 208 (a).

12 Naturally this consideration of competitive conditions by the Administrator must be limited to the record made at the hearing before him. With the duty upon the Administrator to consider the competitive conditions between closely related industries, he should call for evidence on this issue, if such evidence is not adduced by the interested parties. Here, evidence and argument on this issue was presented by the parties.

competitive unfairness in the definition. Just as a cotton mill making a fabric of more than 25% wool will have to pay a minimum wage of 36 cents so a woolen mill making a fabric of not more than 25% wool will be subject to a minimum wage order of 32½ cents. We conclude that the Administrator's determination that the combined effect of the woolen and textile wage rates will give no competitive advantages to any group in either industry is entirely proper in respect of fabrics.

## IV. Competitive Conditions Raised by the Yarn Definition.

The yarn definition, however, causes greater difficulty. This definition states in substance that yarns containing any amount of wool when made on a "woolen system" are subject to the 36 cent order while yarns made on a "cotton system" unless containing over 45% wool are subject to the 32½ cent order. Thus the minimum wage of those working on yarns with any amount of wool through 45% depends upon whether a cotton or a woolen system is being used. The distinction between the systems may be epitomized by saying that the former uses ring spindles, the latter, "mules".

We agree with petitioners that such a distinction prima facie gives a competitive disadvantage to the woolen industry. The respondent argues that the definition is reasonable, nonetheless, for the Administrator may distinguish industries upon a mill as well as a product basis. The mill basis makes possible a definition which does not so completely cut across plant lines. But the avoidance of this does not alone justify such a classification for we have seen that one of the purposes of the Act is to eliminate as rapidly as practicable competitive advantages due to substandard wages, and we have determined that in this case the Administrator was bound to adequately consider the competitive conditions.

The Administrator, however, did consider competitive conditions and found that "the 36 cent minimum will not cause competitive disadvantage to the Woolen Industry as defined or to any group in the industry which is engaged in the manufacture of wool mixtures subject to this recommended rate." Our task, then, is to determine whether there was substantial evidence to support this finding.

## V. The Evidence to Support the Administrator's Conclusion on the Yarn Definition.

The petitioners after pointing out the prima facie unreasonableness of the definition proceed to present persuasive arguments, but they point to no specific evidence showing a competitive disadvantage. We shall, therefore, present a main part of the Administrator's general evidence and analyze it much as the petitioners have done to ascertain whether it supports the finding.

The evidence with which we deal does not show that the distinction created by the yarn definition is justified because of any significant difference between the yarn produced on a woolen and on a cotton system. (We disregard entirely certain evidence objected to by petitioners which tended to show such significant differences.) But that is not the only kind of evidence that will justify a finding of no competitive disadvantage.

It was shown because of the high average wages paid in the woolen industry that the 36 cent minimum will increase the wage bill of the industry only .57%. The application of the 26% ratio of labor costs to total manufacturing costs results in a .15% increase in the latter. That certainly falls within de minimus.[13] The minimum wage therefore plays an insignificant part in the situation that may give a competitive disadvantage to the woolen industry. This analysis is applicable to yarns for the average wage there is 52.3 cents while for the whole industry it is 53.9. But this does not deal specifically with part-wool yarns. As petitioners have pointed out it is reasonable to infer that the average wage in the part-wool branch of the woolen industry would be lower because it is in competition with similar textile products. The part-wool yarn branch is a substantial portion of the whole, however, and its wages would be recognizably reflected in the total average. It is also possible to infer aside from this that a part is roughly in line with the whole. The finding made is compatible with these latter inferences. Petitioners

---

[13] Compare, Golding, The Industry Committee Provisions of The Fair Labor Standards Act (1941) 50 Yale L.J. 1141, 1151-7.

622

cannot support their case upon review by merely showing another inference. They could have guarded themselves against the finding made by submitting specific evidence on the part-wool yarn branch if such evidence, favorable to them, was in existence.[14]

Of course, the Administrator's resolution of the difficult problem may not remove all competitive disadvantages due to low wages. It is the purpose of Congress to eliminate such unfair competition. But the elimination is to be done only as rapidly as practicable.[15] That is primarily a matter for administrative decision and we are not an administrative tribunal. The scope and the extent of judicial scrutiny over administrative action depends upon the statute, the adequacy of the process below, and a sound relationship between the two branches of government. Taking these factors into account here we find no error.

Affirmed.

EDGERTON, Associate Justice (concurring).

In defining the industries, the Administrator considered competitive interrelationships. Opp Cotton Mills v. Administrator, 312 U.S. 126, 139, 149, 61 S.Ct. 524, 85 L. Ed. 624. But once an industry has been defined, Section 8(c) appears to confine the competitive advantages, which the industry committee is to consider, to such advantages as are enjoyed by groups within the industry itself. And Section 8(d) requires the Administrator to approve the committee's recommendations if, among other things, he finds that, "taking into consideration the same factors as are required to be considered by the industry committee," its recommendations will carry out the purposes of the section. It appears to me that the Administrator, like the committee, is not required to take into consideration competition between different industries. In other respects, including the result, I concur in the opinion of the court.

[14] Compare Northern Pac. Ry. Co. v. Dep't of Public Works, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836.

[15] Compare, "The committee realizes that undesirable labor conditions of long standing shown by evidence to exist in our country cannot be blotted out overnight, and that geographical and industrial diversities in a nation as large and as heterogeneous as ours cannot be ignored. Practical statesmanship suggests the wisdom of a cautious legislative approach to the progressive realization of these social and economic objectives." Sen. Rep. No. 884, 75th Cong., 1st Sess. (1937), 4.