**SNEAKER CIRCUS, INC., Blazer Sports International, Inc., and Bob Wolf Associates, Inc., Plaintiffs,**

v.

**Jimmy CARTER, President of the United States, Robert S. Strauss, Special Representative for Trade Negotiations, Stephen J. Lande, Deputy Special Representative for Trade Negotiations, and United States International Trade Commission, Defendants:**

No. 77–C–1135.

United States District Court,
E. D. New York.

Sept. 20, 1978.

Vincenti & Schickler, by Vito Vincenti and Jonathan S. Gaynin, New York City, for plaintiffs.

David G. Trager, U. S. Atty., E.D.N.Y., by Joan M. Dolan, Asst. U. S. Atty., Brooklyn, N. Y., for defendants.

Collier, Shannon, Rill, Edwards & Scott, by Lauren R. Oldak, and Daniel S. Kozma, Washington, D. C., and Skadden, Arps, Slate, Meagher & Flom, New York City, for intervenor defendant American Footwear Industries Ass'n.

## MEMORANDUM DECISION

COSTANTINO, District Judge.

This is an action to set aside two Orderly Marketing Agreements ("OMAs") negotiated by the Special Trade Representative ("STR") pursuant to the Trade Act of 1974, Pub. L. 93–618, Jan. 3, 1975, 88 Stat. 1978, 19 U.S.C. § 2101 *et seq.* ("the Act"). The agreements were negotiated with the governments of Taiwan and South Korea, and they deal with the number of pairs of non-rubber athletic footwear that those two countries will export to the United States.

The plaintiffs are, respectively, a retailer, wholesaler and importer of the type of footwear covered by the OMAs. They originally brought this action in June of 1977, seeking injunctive relief to enjoin the signing of the OMAs. By Memorandum and Order dated June 10, 1977, this court dismissed the case for lack of subject matter jurisdiction, finding that exclusive jurisdiction over the

controversy lay with the Customs Court. The United States Court of Appeals for the Second Circuit reversed that determination and remanded the case for further proceedings. *Sneaker Circus, Inc. v. Carter,* 566 F.2d 396 (2d Cir. 1977).[1]

In accordance with the Court of Appeals decision, this court held a hearing, the initial purpose of which was to determine standing and ripeness [2] and whether preliminary injunctive relief should be granted. Just prior to the close of plaintiffs' case, the court, pursuant to Rule 65(a), Fed. R. Civ. P., consolidated the hearing on standing, ripeness and the preliminary injunction with the trial on the merits.

Plaintiffs allege three general grounds to set aside the OMAs. They claim that (1) the International Trade Commission ("ITC"), in making its "good cause" determination, failed to comply with § 201 of the Act, 19 U.S.C. § 2251 [3]; (2) that the President failed to comply with §§ 202 and 203 of the Act, 19 U.S.C. §§ 2252 and 2253; and (3) that the OMAs violate the Treaties of Friendship, Commerce and Navigation between the United States and the Republic of Korea, entered into force November 7, 1957. 8 U.S.T. 2217, TIAS No. 3974, and the United States and the Republic of China, entered into force November 30, 1948, 63 Stat. 1300, TIAS No. 1871,[4] the General Agreement on Tariffs and Trade, entered into force for the United States January 1, 1948, 61 Stat. Parts 5 and 6, TIAS 1700, and § 1 of the Sherman Act. Before reaching the merits of plaintiffs' claims, the court must decide three preliminary issues: (1) whether the plaintiffs have standing to maintain this lawsuit; (2) whether the action is ripe for adjudication; and (3) whether the court has personal jurisdiction over the defendants.[5]

1. The basis for the Court of Appeals ruling was that because of the voluntary nature of the agreements involved here, and because violation of the export limits under the agreements would subject the foreign exporter to heavy civil and criminal sanctions in the country of export, "[there] is . . . *every likelihood* that the agreements will be effectively enforced abroad, with the result that no occasion for protest under section 514 [of the Tariff Act of 1930] will ever present itself, and no Customs Court jurisdiction under 28 U.S.C. § 1582 will arise." *Sneaker Circus, Inc. v. Carter, supra* at 399 (emphasis added). The Court therefore concluded that "the case will never ripen sufficiently to meet the statutory requirements for jurisdiction [of the Customs Court]. When this situation occurs, jurisdiction over a customs matter which presumptively inheres in the Customs Court reverts to the District Court . . .." *Id.* at 399–400.

At the trial held by this court on the remand from the Court of Appeals, the government introduced certain evidence with respect to how the OMAs, which had been signed and become effective in late June, 1977, were being implemented. The purpose of this evidence, which had not been available for presentation to the Court of Appeals, was to show that, in fact, events had taken place which could have triggered Customs Court jurisdiction. The defendants originally wished to have this court consider such evidence and make another ruling on the question of subject matter jurisdiction. Plaintiffs argued that the decision by the Court of Appeals on that issue was the law of the case and that this court had no authority to reconsider the question. The court, on the ba-

sis of cases such as *United States v. Fernandez,* 506 F.2d 1200 (2d Cir. 1974) and *Banco Nacional de Cuba v. Farr,* 383 F.2d 166 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968), agreed with plaintiffs, but accepted the evidence solely for the purpose of making a record to preserve the defendants' right to seek a reversal by the Court of Appeals of its determination, *see United States v. Fernandez, supra* at 1203–04. The court will not make a new determination on the jurisdictional question.

2. The issues of standing and ripeness had been specifically left for determination by this court. *Sneaker Circus, Inc. v. Carter, supra* at 402.

3. Section 201 (e) of the Act provides that the ITC shall not investigate a given subject matter within one year of a previous report to the President involving the same subject matter unless it determines that good cause exists for such reinvestigation.

4. The plaintiffs have moved to amend their amended complaint, which includes a cause of action alleging violation of the Friendship treaty with Korea, to include a cause of action for violation of the treaty with China. Since, for purposes of this lawsuit, the legal and factual issues with respect to both treaties are the same, the motion to amend the amended complaint is granted.

5. At first blush, it might appear that there is also an issue involved here as to whether the case deals with a nonjusticiable political ques-

## I. Standing

 In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (*"Data Processing"*), the Supreme Court recognized that "[g]eneralizations about standing to sue are largely worthless as such." The one generalization that the Court found to be valid, however, is that under Article III of the Constitution, the federal judicial power is limited to "cases" and "controversies." In terms of the Article III case or controversy requirement, the question with respect to standing is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues" to the court. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).[6] Put another way, "when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (*"Simon"*). *See also Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The injury which must be shown is some "threatened or actual injury" to the plaintiff, *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), which *"fairly* can be traced to the challenged action of the defendant," *Simon, supra,* 426 U.S. at 41, 96 S.Ct. at 1926 (emphasis added). The test articulated in these cases has been referred to as "injury in fact," *see, e. g., Data Processing, supra,* 397 U.S. at 152, 90 S.Ct.

827, and it is clear that these plaintiffs have shown such injury.

In addition to the fact that the allegations in the complaint are sufficient to establish the standing of these plaintiffs to maintain this action, *see* Second Amended Complaint ¶¶ 3–5, 29, the evidence offered at trial fairly supports those allegations. Plaintiffs have shown that since the effective date of the OMAs they have been unable to have orders filled in Korea and Taiwan because the monthly factory quotas of their manufacturers had already been filled, as a result of which orders placed with the plaintiffs by their customers have been cancelled. *See, e. g.,* Transcript at 29–35, 230, 390–92. Plaintiffs have also shown that after the effective date of the OMAs the cost to them of the footwear increased rather substantially, *see, e. g.,* Transcript at 38, 258.

 Plaintiffs have therefore shown the requisite injury to establish standing, especially in light of the statement by the Supreme Court that " 'an identifiable trifle is enough for standing . . .,' " *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 n. 14 (1973), quoting from Davis, *Standing: Taxpayers and Others,* 35 U. Chi. L. Rev. 601, 613. In addition, the injury which plaintiffs have shown can fairly be traced to the challenged actions of the defendants. *See Simon, supra,* 426 U.S. at 41, 96 S.Ct. 1917. Indeed, the injury shown here is far more direct than the injury in other cases in which plaintiffs have been found to have standing. *See, e. g., Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52,

---

tion. However, the Second Circuit Court of Appeals has determined that

> *Sneaker Circus* does not, in the first instance, challenge the *substance* of the trade agreements. Were it to do so, we would be unable to consider the case on its merits, for it would then be nonjusticiable [as a political question]. *Sneaker Circus,* rather, challenges the *procedures* employed by the Executive in concluding these agreements, procedures which are mandated by statute, and which accordingly are within the proper supervision of the federal courts.

*Sneaker Circus, Inc. v. Carter, supra* at 402 (emphasis in original).

> Thus, this court may hear the case solely to determine whether there was compliance with the statutory procedures.

6. With the benefit of hindsight, since the court has presided over the full trial in this case, the court notes that it cannot imagine the issues being presented more sharply or with greater vigor that they were presented by these plaintiffs.

96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *United States v. SCRAP, supra.* Moreover, the injury shown is likely to be redressed by a favorable decision, *Simon, supra,* 426 U.S. at 38, 96 S.Ct. 1917, since if the court sets the OMAs aside, the quotas established thereunder would likewise be set aside and the plaintiffs would once again be able to obtain as much footwear as they desire. Thus it is clear that plaintiffs meet the traditional "injury in fact" test for standing.

·[5] All parties here assert that in addition to an injury in fact, plaintiffs must show that they are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830, before they can be found to have standing. Notwithstanding the fact that all parties urge the application of the "zone of interests" test to this case, the court concludes that to apply it here would be inappropriate.

*Data Processing, supra,* the case in which the "zone of interests" test was first enunciated, was a suit brought pursuant to § 10 of the Administrative Procedure Act, 5 U.S.C. § 701 ("APA"). It is clear, both from *Data Processing* and subsequent cases that the test established therein applies to cases brought under the APA. *See Simon, supra,* 426 U.S. at 38, 96 S.Ct. 1917; *id.* at 65, 96 S.Ct. 1917 (concurring opinion of Brennan, J.,); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Since the instant action is not brought pursuant to the APA, see Second Amended Complaint ¶ 1, the court need not apply the "zone of interests" test.[7]

Assuming *arguendo* that the "zone of interests" test does apply to this case, the plaintiffs here would still have standing. The test, as set forth in *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830, is whether plaintiffs are "arguably within the zone of interests to be protected *or regulated*" (emphasis added) by the statute in question. Whatever may be said about whether plaintiffs' interests are within the zone to be *protected* by the Trade Act, *see* Plaintiffs' Memorandum Concerning Plaintiffs' "Standing to Sue" and Whether This Action is "Ripe for Adjudication" at 22–29; Intervenor Defendant's Reply to Plaintiffs' Memorandum on Standing and Ripeness and Opposition to Plaintiffs' Motion for a Preliminary Injunction at 7–13, it is clear that those interests are arguably within the zone to be *regulated* by the Act. The Act in general, and § 2251 *et seq.* in particular, are specifically aimed at regulating imports in order to benefit domestic industry. *See* 19 U.S.C. § 2102 (4). The plaintiffs, as stated at the outset, are directly involved in the business of selling imported non-rubber footwear and are clearly in the "marketing chain" of such footwear. *Cf. Harry H. Price & Sons, Inc. v. Hardin,* 425 F.2d 1137, 1140 (5th Cir. 1970). The court therefore is satisfied that these plaintiffs would meet the "zone of interests" test were that test applied to this case.

In light of the foregoing discussion, the court concludes that plaintiffs have standing to maintain this action.

## II. *Ripeness*

With respect to whether the instant case is ripe for adjudication, all parties direct the court's attention to *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)[8] for the appro-

---

**7.** There is some doubt as to the continued vitality of the "zone of interests" test. As Professor Davis points out at page 181 of the latest supplement to his June 1976 treatise on Administrative Law of the Seventies (July 1977 Supp.), "[s]ince the [Supreme] Court has not mentioned that test in its latest eighteen majority opinions about standing, and since it was relevant to a good many of the cases . . ., it has become extinct . . . ." Notwithstanding Professor Davis' comment, the Court

of Appeals for the Second Circuit has, at least on occasion, discussed the "zone of interests" test, but, again, in the context of a suit brought pursuant to the APA. *See Evans v. Lynn,* 537 F.2d 571 (2d Cir. 1975), *rev. en banc,* 537 F.2d 589 (2d Cir. 1976).

**8.** The Second Circuit Court of Appeals, in its decision in *Sneaker Circus, Inc. v. Carter, supra,* also cited to *Abbott Laboratories* in stating that this court must determine as a threshold

priate standard to be applied. *While Abbott Laboratories* and its companion case, *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), deal with the ripeness of cases brought pursuant to § 10 of the APA and therefore may not be totally applicable to this case, those decisions do apply here insofar as they stand for the proposition that federal courts will not undertake to decide the propriety of governmental action unless such action "has been formalized and its effects felt in a concrete way by the challenging party." *Abbott Laboratories, supra,* 387 U.S. at 148–49, 87 S.Ct. at 1515. Put more generally, " 'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969), *quoting from Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

■ Whatever the result might have been when this suit was commenced in June 1977 prior to the signing of the OMAs, the relevant inquiry for the court is whether the requisite "controversy" existed at the time of the trial following the remand from the Court of Appeals. *Golden v. Zwickler, supra,* 394 U.S. at 108, 89 S.Ct. 956. At that time, the OMAs had been in effect for approximately six months and the plaintiffs had had orders turned down by their Korean and Taiwanese manufacturers, and consequently had lost orders from their customers. *See* Transcript at 29–35, 230, 390–92. The court concludes that the case is ripe for adjudication, since the challenged action has been felt by the plaintiffs in a concrete way and the issues presented are appropriate for judicial determination. *See Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. 1507.

### III. *Personal Jurisdiction*

In addition to moving to dismiss this action on the grounds that plaintiffs lack standing and that the case is not ripe for adjudication, defendants move to dismiss on the grounds that they are not amenable to suit. They argue that the suit is in effect one against the United States rather than against the individual named defendants and, as such, is an unconsented suit against the sovereign which is barred by the doctrine of sovereign immunity.[9] They also argue that the ITC is not capable of being a party defendant in this or any other proceeding.

The defendants' contention that the suit is actually against the United States is without merit. It may be true that as a general rule a suit which is nominally against an officer of the government will be deemed a suit against the sovereign if the relief sought would operate against the sovereign by either restraining the government from acting or compelling it to act. *Hawaii v. Gordon,* 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191; *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The defendants argue that because the effect of the relief sought by the plaintiffs would be to restrain the government from proceeding with its program of relief for the domestic footwear industry, the action is against the United States rather than the named defendants. Defendants' Proposed Findings of Fact and Conclusions of Law at 64–65. Defendants argument, however, fails to take into account the exception enunciated by the Supreme Court in *Larson v. Domestic & Foreign Commerce Corp., supra* to the general rule stated above. The Court there stated that

> [t]here may be, of course, suits for specific relief against officers of the sover-

question whether the case is ripe for adjudication.

**9.** Defendants have framed this issue in terms of lack of personal jurisdiction, although it is clear from their discussion that they are actually claiming sovereign immunity. *See* Defendant's Proposed Findings of Fact and Conclusions of Law, 64–67.

eign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign. . . . On a similar theory, *where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.* The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient. And, since the jurisdiction of the court to hear the case may depend . . . upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies.

337 U.S. at 689–90, 69 S.Ct. at 1461 (emphasis added)

■ This case falls squarely within the quoted exception to the general rule of sovereign immunity. Plaintiffs here claim that the President and the ITC exceeded their *specific statutorily delegated authority* by failing to comply with the provisions of the Trade Act, and they specify the statutory limitations upon which they rely. If the plaintiffs are successful on the merits and the court finds that the statutory provisions were not complied with, then the actions of the ITC and the President would not be actions of the sovereign, since they would have been performed without authority.[10] Accordingly, the suit is not one against the United States and it is not barred by the doctrine of sovereign immunity.

■ Nor would the doctrine of executive immunity bar this suit. It is clear that executive action may be restrained indirectly by enjoining a cabinet member from enforcing an executive order found to violate the law. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Atlee v. Nixon,* 336 F.Supp. 790, 792 (E.D.Pa.1972). And "[t]here is not the slightest hint in any of the *Youngstown* opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party." *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 67, 487 F.2d 700, 709 (1973); *National Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 345, 492 F.2d 587, 611 (1974).

The *Youngstown* case has been characterized as exemplifying "the Judicial power, by compulsory process or otherwise, to prohibit the Executive from engaging in actions contrary to the law. Youngstown represents the principle that no man, cabinet minister or Chief Executive himself, is above the law; . . ." *Nixon v. Sirica, supra* at 793 (Wilkey, J., dissenting) (footnote omitted). If judicial review was appropriate to decide the propriety of the executive order in *Youngstown,* it is certainly appropriate in the instant case where Congress has established specific statutory procedures which must be followed by those to whom it has delegated power. Indeed, the Court of Appeals for the Second Circuit has already made it clear that the question of compliance with the statutory procedures is "within the proper supervision of the federal courts", *Sneaker Circus v. Carter, supra* at 402.

■ Defendants also argue that the ITC is not a suable entity. That argument is likewise without merit. The ITC has been sued in cases such as *Import Motors, Ltd. v. United States International Trade Commission,* 530 F.2d 940 (C.C.P.A.1976), and *SCM Corporation v. United States International Trade Commission,* 179 U.S.App.D.C. 110,

10. There is no dispute that but for the provisions of the Act, the President would have been without power to enter into the OMAs.

549 F.2d 812 (1977). The *SCM* case was an action to compel the ITC to set aside a negative determination of injury under the Antidumping Act of 1921. This case is, in effect, an action to compel the ITC to set aside an affirmative determination of good cause under the Trade Act of 1974. If the ITC was suable in a case such as *SCM, supra,* it is certainly also suable here.

The court accordingly finds that it has personal jurisdiction over these defendants.

## IV. *The Merits*

The court now turns to a consideration of the merits of plaintiffs' claims.

## A. *Alleged Improprieties By the ITC*

1. Section 201(e) of the Act, 19 U.S.C. § 2251(e), provides that the ITC may not reinvestigate a given subject matter within one year from the date of its previous report to the President on the same subject matter, "[e]xcept for good cause determined by the Commission to exist."

In September of 1975, in response to an industry petition brought pursuant to § 201(a)(1) of the Act, 19 U.S.C. § 2251(a)(1), the ITC had conducted an investigation of non-rubber footwear and had issued its report to then-President Ford, as required by § 201(d)(1) of the Act, 19 U.S.C. § 2251(d)(1), on February 8, 1976. In its report, the ITC was unanimous in its finding of injury to the domestic footwear industry caused by imports, but it could not agree on the appropriate remedy to aid in the recovery of that industry (D. Ex. L. at 3–6).[11] President Ford determined that adjustment assistance under the Act was the most effective remedy, see 19 U.S.C. § 2271 *et seq.,* and declined to grant import relief under § 203 of the Act, 19 U.S.C. § 2253.

On September 22, 1976, less than one year after the previous report on non-rubber footwear had been submitted to the President by the ITC, the Senate Finance Committee unanimously approved a resolution directing the ITC to institute a new footwear investigation. The resolution went on to state that "[i]t is the sense of the Committee that changed circumstances, including increasing imports and rapidly deteriorating economic conditions in the domestic footwear industry, constitute good cause, within the meaning of section 201(e) of [the] Act, to commence an investigation." (P. Ex. 37). A copy of the resolution was transmitted to the chairman of the ITC and was received by the ITC on September 28, 1976 (P. Ex. 37). The ITC then asked its staff to compile information to assist it in making its good cause determination. After receiving the staff report, the ITC met on October 5, 1976 to consider whether good cause existed to commence a new investigation of the footwear industry, and it found that such good cause did exist.

The plaintiffs challenge the authority of the ITC to consider the question of good cause on the basis of the Senate Finance Committee resolution. They argue that the ITC can proceed with a good cause determination only after presentation by the *industry* of substantial new evidence to justify a reinvestigation and that the ITC's determination was therefore invalid.

Plaintiffs' position finds absolutely no support in the language of the statute. Section 201(e) is completely silent on the question of who may request a reinvestigation. Indeed, there is nothing to indicate that the ITC could not make a good cause determination on its own without a request or petition for reinvestigation from some other entity or person. Had Congress intended to limit the authority to make such a request to a particular group, it could easily have so specified in the statute. It did not. Moreover, pursuant to § 201(b)(1) of the Act, 19 U.S.C. § 2251(b)(1), the Senate Finance Committee is one of the bodies authorized to request the ITC to conduct an initial investigation. An industry may petition for such an investigation pursuant to § 201(a)(1) of the Act, 19 U.S.C. § 2251(a)(1). If the court were to accept plaintiffs' position, it would mean that Con-

---

11. Letters in parentheses preceded by "D. Ex." refer to defendants' exhibits in evidence.

Numbers in parentheses preceded by "P. Ex." refer to plaintiffs' exhibits in evidence.

gress reserved to an industry the right to request a reinvestigation while not reserving that same right to the persons or entities entitled to request an initial investigation under § 201(b)(1). There is nothing in the Act to indicate that Congress intended such a result. In fact, § 201(e) refers to "investigation[s] for the purposes of this section . . .," referring to *all* of § 201. Since the Senate Finance Committee may request an investigation under § 201(b)(1), that type of investigation is included within the language of § 201(e).

Plaintiffs, apparently recognizing that their position is unsupported by the language of the Act itself, direct the court's attention to the legislative history. The portion of the legislative history upon which plaintiffs rely states, in discussing the good cause exception to the prohibition on reinvestigations within one year of a prior report, that "[t]he Committee believes that this exception is necessary for those instances in which an industry can produce, to the satisfaction of the Commission, sufficient new evidence to warrant reconsideration of the case." 1974 U.S.Code Cong. & Admin.News, at 7267. Plaintiffs argue that that language shows that Congress intended that a reinvestigation could be instituted only when the ITC has been presented *by an industry* with sufficient new evidence to warrant such action.

Where the meaning of the statute is clear, there is no necessity to look to the legislative history. *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *Aviation Consumer Action Project v. Washburn*, 175 U.S.App.D.C. 273, 535 F.2d 101, 106 (1976); 82 C.J.S. Statutes § 351 at p. 736 (1953). Here, it is clear from the face of the statute that the only requirement with respect to § 201(e) is that the ITC must determine that good cause exists before commencing a reinvestigation within one year of the previous report to the President. There is nothing in the statute to suggest the type of limitation that plaintiffs urge as to who may seek a good cause determination. Any uncertainty as to the plain meaning of the statute arises from plaintiffs' reference to the legislative history, rather than from the language of the Act itself. Because "[t]he proper function of legislative history is to solve and not to create an ambiguity," *United States v. Blasius*, 397 F.2d 203, 206 (2d Cir. 1968), *cert.* dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969), and because reference to the legislative history here could create an ambiguity, such reference in this case would be inappropriate. Accordingly, the court concludes that the ITC properly proceeded to consider the issue of good cause following its receipt of the Senate Finance Committee resolution.[12]

12. Even if the court were to consider the legislative history, it would still find plaintiffs' arguments to be without merit. The Trade Act of 1974 superseded, in certain respects, the Trade Expansion Act of 1962, Pub.L. 87–794, Oct. 11, 1962, 76 Stat., 872. The provision of the prior act which dealt with the same area as § 201 of the 1974 Act was § 301, 19 U.S.C. § 1901. Section 301(a)(1) was the predecessor of § 201(a)(1) of the 1974 Act; section 301(b)(1) was the predecessor of § 201(b)(1) of the 1974 Act; and section 301(b)(4) was the predecessor of § 201(e) of the 1974 Act. Under section 301(b)(4) of the 1962 Act, an industry simply could not petition for reinvestigation within one year of a previous report on the same subject matter. The prohibition was absolute and it applied *only* to reinvestigations sought by the industry. Thus, under the prior law, the Senate Finance Committee could request an investigation under § 301(b)(1) *even if* a previous report on the same subject matter had been issued less than one year earlier.

There is nothing in the 1974 Act or its legislative history to indicate that Congress intended to prohibit the Senate Finance Committee from exercising the power it had had under § 301 of the 1962 Act. The court therefore reads the portion of the legislative history referred to by plaintiffs as *removing* the prohibition on industries to seek reinvestigation within one year, and not as imposing such a prohibition on everyone but industries.

At least one ITC Commissioner believes that a request for reinvestigation from any of the bodies or persons enumerated in § 201(b)(1) of the Act constitutes good cause, in and of itself, to conduct such reinvestigation. *See* Views of Commissioner Italo H. Ablondi in the Report to the President on Footwear dated February 1977 (D. Ex. M at 38–39). Commissioner Ablondi interprets that portion of the legislative history referred to by plaintiffs to mean that new evidence must be presented only by an industry but that "the intent of Congress was to reserve

.2. Plaintiffs next challenge the ITC determination of good cause on the grounds that no formal public notice was given that such a determination was being considered and that no public hearings were held to give interested parties an opportunity to be heard and to present evidence on the question.

■ There is no requirement in § 201(e) of the Act that public notice be given or that public hearings be held prior to the good cause determination by the ITC. Plaintiffs' attempt to read a notice and hearing requirement into § 201(e) by referring to § 201(c), 19 U.S.C. § 2251(c), which provides that "in the course of any proceeding under *subsection (b)* of this section [emphasis added] . . .," public notice must be given and public hearings must be held. Plaintiffs argue that since § 201(b) is the only section authorizing the Senate Finance Committee to request an investigation by the ITC the above-quoted requirement of subsection (c) applies to this proceeding even though this proceeding arises under subsection (e). Plaintiffs' reading of the statute is troubled at best and can be disposed of quite simply by stating that if Congress had intended for the ITC to give notice and hold hearings before making a good cause determination under subsection (e) it would have said so. However, Congress specifically limited the notice and hearing requirements to proceedings brought under subsection (b), and, if any inference can be drawn from that limitation, it is that Congress determined that notice and a hearing are *not* required under subsection (e).

■ As the intervenor points out, there are sound policy reasons for treating proceedings under § 201(b) differently from proceedings under § 201(e). *See* Intervenor Defendant's Post-Trial Memorandum of

Law on the Merits at 33. A proceeding under § 201(b) goes to the merits of the question of whether import relief should be provided to assist a domestic industry because it is being seriously injured by imports. A decision under § 201(b) will affect the rights and property interests of the interested parties and they are therefore provided with notice and an opportunity to be heard so as not to run afoul of the Due Process Clause of the Constitution. The situation is quite different with respect to a good cause determination under § 201(e), since no rights or property interests of the parties are affected by that determination. *See Hannah v. Larche,* 363 U.S. 420, 440–44, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). Should the ITC determine that good cause does exist, then the public is provided with notice and interested parties are given the opportunity to be heard before the Commission makes its determination on the merits. The only effect of the good cause determination is to allow a reinvestigation within one year rather than after the expiration of one year from the previous report to the President on the same subject matter. In either case interested parties are given notice and an opportunity to be heard before their rights or property interests are affected by a decision on the merits, and it is thus not a violation of the Due Process Clause not to require notice and a hearing on the threshold question of good cause. *See Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 152–53, 61 S.Ct. 524, 536, 85 L.Ed. 624 (1941). ("The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective.").

Plaintiffs' reliance on *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), *cert.*

to the named congressional committees, the President, and the STR the right to *require* the Commission to institute an investigation, even when such investigation comes within the provisions of section 201(e)." (D. Ex. M at 39) (emphasis added).
Commissioner Ablondi's views are consistent with the view the court has set forth with

respect to who may request a reinvestigation. The court need not decide the correctness of Commissioner Ablondi's view on what constitutes good cause, since in this case the ITC made a good cause determination based on more than the Senate Committee resolution. *See infra.*

*denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) is plainly misplaced. There the court was dealing with the question of whether notice and a hearing would be required before a federal agency could make a determination as to whether a proposed major federal action would " 'significantly [affect] the quality of the human environment . . .' " for purposes of § 102 of the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332. That decision would, in turn, determine whether or not an environmental impact statement would be required. The court held that notice and an opportunity to be heard were required before the agency could make the threshold determination of "significance." 471 F.2d at 836.

Plaintiffs here argue that the *Hanly* holding should be applied to this case. There are, however, two significant factors which differentiate this case from *Hanly* and which lead to a different result. The first is that in *Hanly* there was a specific provision in NEPA requiring the agency to develop methods and procedures to insure that certain factors be taken into consideration in decision making. 42 U.S.C. § 4332(2)(B). No such statutory requirement is present in this case with respect to the good cause determination under § 201(e). Indeed, Congress has specifically left that determination to the discretion of the ITC without directing it to follow or establish any particular methods or procedures in arriving at its decision.[13]

The second and more important factor which differentiates this case from *Hanly* is that in *Hanly* the threshold determination of significance was dispositive of plaintiffs' rights. Once the agency involved found that the proposed project would have no significant affect on the environment, it was not required to file an environmental impact statement, the preparation of which would have provided the opportunity for a hearing. Thus the plaintiffs in that case *never* had an opportunity to present their views and evidence to the responsible agency prior to the rendering of the final decision on the merits by that agency. Here, however, the ITC conducted two days of public hearings on the merits after it found good cause, and all interested parties had the opportunity to participate in those hearings before a decision on the merits was reached.[14] Thus this case is readily distinguishable from *Hanly.*

For the foregoing reasons the court concludes that the ITC was not required to give public notice that it was considering the good cause issue or to hold public hearings on that issue.[15]

3. Plaintiffs also attack the good cause determination itself, claiming that it was not supported by sufficient evidence. As a preliminary matter, the court must decide whether the good cause determination by the ITC is subject to judicial review.

 While it is true that the Court of Appeals for the Second Circuit has authorized this court to review the *"procedures*

**13.** Plaintiffs argue that by vesting the ITC with such wide discretion in making the good cause determination, Congress has unconstitutionally delegated its legislative functions to the executive branch. *See* Plaintiffs' Post-Trial Memorandum at 57. That argument is without merit. The determination of good cause is simply a factual determination and is in no sense a legislative function. *See Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 145, 61 S.Ct. 524, 85 L.Ed. 624 (1941). Congress has determined the legislative policy, *see* 19 U.S.C. § 2102, and has established procedures to be followed with respect to those administrative findings which affect the rights and interests of the public. That it has left a purely threshold decision which affects only the timing of an investigation to the discretion of the ITC does not constitute an unconstitutional delegation of authority from Congress to the executive.

**14.** The court notes in passing that apparently none of these plaintiffs participated in those public hearings.

**15.** Plaintiffs also argue that by failing to provide notice and an opportunity to be heard the ITC violated the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Aside from the fact that the precise nature of the alleged violations is not made clear, *see* Plaintiffs' Post-Trial Memorandum at 55–57, plaintiffs have not asserted jurisdiction under the APA in their complaint. Accordingly, the court need not consider that claim at the present time.

employed by the Executive in concluding these agreements . . .," *Sneaker Circus v. Carter, supra,* 566 F.2d at 402 (emphasis in original), the plaintiffs, by claiming that the good cause determination was not supported by "sufficient new evidence to warrant reconsideration," *see* Plaintiffs' Post-Trial Memorandum at 36, challenge the substance of that determination rather than the procedures utilized in reaching it. In effect, plaintiffs argue that the ITC finding of good cause was erroneous, and they ask this court to substitute its judgment for that of the ITC. This the court cannot and will not do.

■ The determination of good cause is, in effect, the equivalent of a decision by the ITC to commence an investigation within one year of a previous report to the President on the same subject matter. As such, it is a decision which would have been within the discretion of the ITC even if it had not specifically been left to ITC discretion by § 201(e). Accordingly, that decision is not reviewable. *Cf. City of Chicago v. United States,* 396 U.S. 162, 165, 90 S.Ct. 309, 311, 24 L.Ed.2d 340 (1969) ("[w]hether the [Interstate Commerce] Commission should make an investigation . . . is of course within its discretion, a matter which is not reviewable.").

Plaintiffs contend, however, that they are entitled to review of the good cause determination under § 702 of the Administrative Procedure Act, 5 U.S.C. § 702. Even if plaintiffs had alleged jurisdiction under the APA, which they have not, their argument would be without merit.

■ Judicial review of agency action is available under the APA except to the extent that statutes preclude such review or agency action is committed to agency discretion by law. 5 U.S.C. § 701(a).[16] The

latter exception applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) ("*Overton Park* "). This case is clearly such a "rare instance."

■ In drafting § 201(e) of the Trade Act, Congress did not define good cause; nor did it establish any criteria or guidelines for the ITC to follow or set forth any factors which the ITC must consider in reaching its good cause determination. *Compare* §§ 201(b)(2) and (b)(3), 202(c). There is simply no law as to what constitutes good cause, that decision having been left solely and exclusively to the discretion of the ITC, and there is thus no law for the court to apply in reviewing the ITC determination on that issue. Accordingly, the court holds that even under the Administrative Procedure Act the good cause determination by the ITC would be unreviewable.[17]

■ Assuming *arguendo* that the good cause determination was reviewable under the APA, it would nonetheless have to be upheld by the court. It is not the proper function of the court to substitute its judgment for that of the ITC on the question of good cause. *Cf. Overton Park, supra* at 416, 91 S.Ct. 814. Indeed, it would be both unfeasible and impractical for the court to attempt to review the merits of a determination which rests on complex and subtle evaluations of technical economic data about which the ITC is far more expert than the court. *Cf. Kletschka v. Driver,* 411 F.2d 436, 443 (2d Cir. 1969). The court must determine only whether the ITC decision was arbitrary, capricious or an abuse of discretion. 5 U.S.C. § 706; *Overton Park, supra,* 401 U.S. at 414, 91 S.Ct.

16. There is no claim here that judicial review is precluded by statute.

17. Plaintiffs' reliance on *Overton Park, supra* is misplaced since the Supreme Court found that the statute involved there included "clear and specific directives" to the Secretary of Trans-portation, 401 U.S at 411, 91 S.Ct. 814, that there was thus "law to apply," and that the exemption for action committed to agency review was therefore inapplicable. *Id.* at 413, 91 S.Ct. 814. As the court has already stated, here there simply is no law to apply.

814.[18] Accordingly, it need only consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, supra* at 416, 91 S.Ct. at 824. As previously discussed, there are no "relevant factors" which Congress has required the ITC to consider in determining good cause. The court's inquiry is therefore limited to the question of whether the ITC committed a clear error of judgment in finding that there was good cause to reinvestigate the footwear industry. The court concludes that the ITC did not commit such an error.

Among the data which the ITC had before it at the time of its good cause determination were the following statistics: (1) for each of the first seven months of 1976, imports had increased over the comparable month in 1975 (D. Ex. N, Table 1); (2) for four of the five months March through July, 1976, the ratio of imports to consumption had increased over the comparable month in 1975 (D. Ex. N, Table 1);[19] (3) for the four months April through July, 1976 domestic production decreased from the previous month, with domestic production for July, 1976 actually less than that in July, 1975 (D. Ex. N, Table 1);[20] (4) for the three months May through July, 1976, the rate of increase in employment in the domestic industry steadily declined from the previous month and the unemployment rate increased from the previous month (D. Ex. N, Table 1).

Notwithstanding the existence of other data which might have militated against a finding of good cause, the data enumerated above was sufficient to allow the ITC to find good cause did exist. It is in no way determinative of the issue that plaintiffs' economist, utilizing the same data, reached a different conclusion. *See* Testimony of Dr. Andrew Brimmer, Transcript at 403 *et seq.* Dr. Brimmer conceded that other economists might disagree with his conclusions (Transcript at 489–90). That being the case, the court cannot say that the ITC committed a "clear error of judgment" in making its good cause determination. Therefore, even if that determination were reviewable, it could not be set aside.

4. The final challenge to the ITC's actions in this case goes to the sufficiency of the notice of hearing given by the ITC following its good cause determination (P. Ex. 38). Plaintiffs claim that the notice was insufficient because it failed to state the basis of the good cause determination, the sufficient new evidence upon which that determination was based and the scope of the evidence before the ITC relating to injury to the domestic industry. However, plaintiffs cite to no language in the Act which requires the ITC to include those items in the notice of reinvestigation. Indeed, there is no such language in the Act. Had Congress intended for the ITC to include such information in its notice, it could easily have so provided.[21] It is for Con-

---

**18.** Neither of the other two standards of review under § 706 and *Overton Park, supra* is applicable here. Review under the substantial evidence test is permitted "only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself . . . ," or when the agency action is based on a public adjudicatory hearing." *Overton Park, supra* at 414, 91 S.Ct. at 822. *De novo* review is authorized "when the action is adjudicatory in nature and the agency fact finding procedures are inadequate," *id.,* at 415, 91 S.Ct. at 823, or "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Id.* None of the circumstances that would permit either *de novo* review or review under the substantial evidence test is present here.

**19.** The four months showing an increase were March, May, June and July. The ratio for April was the same in 1976 as in 1975.

**20.** The April, 1976 date is significant because that is when President Ford had announced his decision not to grant import relief.

**21.** *Compare* § 201(e) *with* § 201(d)(1) which specifically requires the ITC to report to the President not only its findings but also the basis therefor. Thus there is every indication that Congress did not intend to require the ITC to publish the basis for its good cause determination.

gress, not the court, to write such requirements into the statute. *Cf. 62 Cases of Jam v. United States,* 340 U.S. 593, 600–01, 71 S.Ct. 515, 95 L.Ed. 566 (1951). The court must confine itself to construction of the law as it is, 82 C.J.S. Statutes § 312 at p. 531, and, as written, the Act does not require the ITC notice to include the information which plaintiffs claim should have been included. Plaintiffs' claim that the notice was deficient is therefore without merit.

■ Plaintiffs also argue that the notice was insufficient because it did not reasonably define the scope of the investigation, as a result of which "interested parties were operating in a vacuum without any notice as to the issues to be met by them." Plaintiffs' Post-Trial Memorandum at 38. This argument is also without merit. The announcement specifies the product to be investigated, the statutory authority for the investigation and the purpose of the investigation. Significantly, plaintiffs do not indicate what additional information should or could have been included in the announcement, and the court finds that the notice was sufficient to apprise the public of the nature and scope of the ITC investigation.

For all the foregoing reasons, the court concludes that the good cause determination and the notice of investigation by the ITC were proper and finds all of plaintiffs' arguments to the contrary to be without merit.

B. *Alleged Violations By the President*

■ In addition to the alleged violations of the Act by the ITC already discussed, plaintiffs also claim that the Act was violated in several respects by the President and his delegates.[22] The court finds each of these claims to be without merit.

1. Plaintiffs' first contention is that the President violated § 202(b)(1) of the Act, 19 U.S.C. § 2252(b)(1). That section provides, in pertinent part, that

within 60 days after receiving a report from the commission containing an affirmative finding under section 2251(b) . . . the President shall—(1) determine what method and amount of import relief he will provide . . . , and publish in the Federal Register that he has made such determination; . . .

The President received the report from the ITC in this case on February 8, 1977. On April 6, 1977, within 60 days after the President received the report, he published in the Federal Register a copy of a memorandum he had sent to STR Strauss on April 1, 1977, Federal Register, vol. 42, No. 66, Wednesday, April 6, 1977 (D. Ex. I). The memorandum stated in part that

pursuant to section 202(b) of the Trade Act of 1974 . . . I have determined the action I will take with respect to the report of the U. S. International Trade Commission (USITC) dated February 8, 1977, concerning the results of its investigation on non-rubber footwear . . . .

I have determined that the import relief remedy recommended by the USITC does not provide a balance among the various interests involved. Therefore, I am directing you to negotiate and conclude the necessary agreements with the appropriate foreign exporting countries to moderate the problems caused to our domestic footwear manufacturers, workers and communities by rapid shifts in foreign exports of non-rubber footwear to the United States. This should be a short term program sufficient to allow the domestic industry to become more competitive.

In seeking these agreements you should remain mindful of the interests of American consumers and the difficult economic problems faced by a number of our trading partners, in particular the developing country suppliers with serious balance of payment deficits.

Plaintiffs argue that the President's memorandum was insufficient to comply

---

**22.** There is no question that the court may review the President's actions to insure that he complied with the statutory procedures mandated by the Act. *See Sneaker Circus v. Carter, supra,* 566 F.2d at 402; Section III, *supra.*

with § 201(b)(1) because it did not detail the "*substance* of the determination by the President . . . in specific terms of 'method and amount,'" Plaintiffs' Post-Trial Memorandum at 111 (emphasis in original), and because it did not provide the requisite information for Congressional review of the President's determination pursuant to § 203(c)(1) of the Act, 19 U.S.C. § 2253(c)(1). *Id.* at 113. Plaintiffs' arguments are based upon a misreading of the statute and must therefore be rejected.

 Section 201(b)(1) requires the President to determine the method and amount of import relief he will provide and to publish in the Federal Register "that he has made such determination." Had Congress intended for the President to publish the *substance* of his determination, as plaintiffs contend, it could have easily so provided, simply by mandating, for example, that he publish "that determination" or "what that determination is." Congress, however, chose only to require that the President publish the fact that he has *made* his determination. This the President clearly did, *see* D. Ex. I, and plaintiffs' argument on that point must fail.[23]

 Plaintiffs' claim that the President's announcement (D. Ex. I) did not supply the requisite information for Congressional review must also fail since it is an altogether different section of the Act that deals with Congressional review. Section

*203(b)(1)* provides that on the date the President determines to negotiate OMAs he shall send Congress a message setting forth the action he is taking and that if his action differs from that recommended by the ITC he shall state the reason for such difference.[24] Section 203(c)(1) provides for Congressional action within 90 days after receipt of the document required to be submitted under *§ 203(b)(1)*. Therefore, plaintiffs' claim that the announcement published by the President in compliance with *§ 202(b)(1)* did not provide sufficient information to allow for Congressional review is without merit since that announcement is not the document upon which Congressional review is to be based.

2. Plaintiffs next argue that the President and his delegates violated § 203(a) of the Act, 19 U.S.C. § 2253(a). That section provides that if the President determines to provide import relief, he shall "to the extent that and for such time (not to exceed 5 years) *as he determines necessary* taking into account the considerations specified in section 2252(c) [emphasis added] . . ." provide relief in one of the forms enumerated. Plaintiffs claim that since the import relief provided by the President (the OMAs) was not "commensurate with the injury as found by the ITC," Plaintiffs' Post-Trial Memorandum at 104, the OMAs should be set aside.

 The phrase "commensurate with the injury found by the Commission" is not

---

23. In fact, the President went further than the statute required him to go. He made it clear that the "method" of import relief would be negotiated agreements. Once the President decided to negotiate such agreements, he could not logically have specified the "amount" of relief, since the amount of relief would depend upon the outcome of the negotiations. Indeed § 2253(h)(5) states that "the import relief provided in the case of an orderly marketing agreement shall be the level of relief contemplated by such agreement." Thus Congress recognized that the amount of relief pursuant to an OMA could not be known until the agreement had been negotiated. Congress also recognized the necessity of allowing additional time for the President to conclude negotiated agreements once he determined to provide that type of import relief. Thus, § 203(e)(1) provides that import relief shall be proclaimed within 15 days after the date of the President's

determination unless he decides to negotiate one or more OMAs, in which case import relief shall be proclaimed within 90 days of the date of the President's determination. The legislative history makes clear that the additional time "is to permit the President to have sufficient time to negotiate an orderly marketing agreement with foreign suppliers." 1974 U.S. Code Cong. & Admin.News, at 7270–71. Plaintiffs claim that the President was required to announce the amount of relief at the time he announced his determination pursuant to § 202(b)(1) is thus not only impractical but also finds no support in the Act or its legislative history.

24. The message submitted to Congress in compliance with § 203(b)(1) (D. Ex. J) is House Document No. 95–117, 95th Cong., 1st Session.

used in the Act itself, but is found in the Report of the Senate Finance Committee. 1974 U.S.Code Cong. & Admin.News at 7270. Nowhere, however, is the phrase defined. The Act itself permits the President, in his discretion, to determine the extent and duration of import relief to be provided. Thus it would appear that the undefined phrase "commensurate with the injury found by the Commission" was meant as a general guide for the President to follow, but that it was left to the President to determine whether a given remedy is "commensurate with the injury."

■■■■■ Plaintiffs' main argument in support of their claim that the relief provided was not commensurate with the injury is that the relief did not cover other countries which also export non-rubber footwear to this country. *See* Plaintiffs' Post-Trial Memorandum at 140–41. However, the decision as to the countries with which OMAs should be negotiated is a purely political question within the meaning of *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). It is precisely the type of question which the Court of Appeals in *Sneaker Circus v. Carter, supra,* 566 F.2d at 402, stated would not be reviewable by the courts.[25] Accordingly, plaintiffs' claim that the import relief provided was not commensurate with the injury found by the ITC and that the President therefore violated § 203(a) of the Act, cannot be accepted.

3. Plaintiffs' next claim is that the President failed to comply with § 203(b)(1) of the Act, 19 U.S.C. § 2253(b)(1). That section requires that on the day the President announces his intention to negotiate OMAs he must transmit to Congress a document "setting forth the action he is taking" and must, if his action differs from that recommended by the ITC, "state the reason for such difference." This document provides the basis for Congressional review under § 203(c)(1), 19 U.S.C. § 2253(c)(1).

Plaintiffs challenge the document which the President sent to Congress, *see* House Document No. 95–117, 95th Cong., 1st Sess. (D. Ex. J), on two grounds. First, they argue that the document was not sent to Congress on the day that the President announced his intention to negotiate the OMAs, which was April 1, 1977. Second, they argue that the document was insufficient to permit Congressional review of the President's determination.

■■■■ Plaintiffs' first contention is not borne out by the facts. While the date on the first page of House Document 95–117 (D. Ex. J) is April 4, 1977, the date on the message from the President, which became House Document 95–117, is April 1, 1977. Moreover, the Congressional Record indicates clearly that the message from the President was received by the Senate on April 1, 1977 and referred to the Committee on Finance. *See* Congressional Record-Senate, April 4, 1977 at S. 5417. Plaintiffs' first contention is therefore without merit.[26]

---

**25.** Plaintiffs have contended throughout the trial that since they presented each of the specific issues involved here to the Court of Appeals on appeal from this court's prior dismissal of the case, and since the Court of Appeals stated that the case did not involve nonjusticiable political questions because plaintiffs' challenge was to procedure rather than the substance of the OMAs, *Sneaker Circus v. Carter,* 566 F.2d at 402, that the Court of Appeals "made a Specific [sic] and express finding that each and every one of these issues were justiciable and adjudicable." Plaintiffs' Memorandum as to the Justiciability of its Claims at 1.

The court reads the language from the Court of Appeals differently from the way plaintiffs read it. As this court understands the holding of the Court of Appeals, *as long as* plaintiffs challenge only the procedures employed in conclud-

ing the OMAs, then their claims are justiciable. If, however, plaintiffs at any time cross the line between procedure and substance, then they cross the line between justiciable claims and nonjusticiable political questions. It is for this court to determine if and when plaintiffs cross that line.

Even if plaintiffs' reading of the Court of Appeals decision is correct, this court's ruling with respect to the claimed violation of § 203(a) would not be affected since that claim was not presented to the Court of Appeals. *See* Exhibit 1 to *Plaintiffs Memorandum as to the Justiciability of its Claims.*

**26.** There was also testimony at the trial by Shirley Ann Coffield, an Assistant General Counsel in the Office of the Special Representative for Trade Negotiations charged with the

Plaintiffs' second argument with respect to the President's message to Congress is also without merit. Section 203(b)(1) requires the President to inform Congress of the "action he is taking." This the President did when he stated that "I have directed the Special Trade Representative to seek the necessary agreements with the appropriate foreign exporting countries to moderate the problems caused to our industry by rapid shifts in trade." (D. Ex. J at 2). Plaintiffs urge that this information was insufficient "to constitute a specification of the 'method and amount' of import relief which the statute requires that the President set forth and transmit to Congress." Plaintiffs' Post-Trial Memorandum at 112. Once again, however, plaintiffs have misread the statute. The requirement of § 203(b)(1) is that the President inform Congress of the *action* he is taking; nowhere does that section require the President to spell out the method and amount of import relief. Indeed, as previously discussed, see note 23 *supra,* Congress recognized that the amount of relief under an OMA could not be specified ahead of time and provided that the relief in such a situation "shall be the level of relief contemplated by such agreement." 19 U.S.C. § 2253(h)(5). Plaintiffs' argument that the President was required to supply to Congress the details of the import relief on the day that he announced his intention to negotiate the OMAs defies logic and finds no support in the statute.[27]

responsibility of insuring compliance with the statutory requirements of the Trade Act, that she spoke with someone at the White House on April 4, 1977 and was told that the President's message to Congress had been transmitted on April 1. (Transcript at 1015–16). Since the documentary evidence supports that statement, the court need not rely on Ms. Coffield's testimony alone to reject plaintiffs' contention.

27. Plaintiffs apparently lose sight of the fact that the OMAs were negotiated agreements rather than unilaterally imposed quotas. Thus, the kind of information which they claim should have been included in the President's announcements under §§ 202(b)(1) and 203(b)(1), *see* Plaintiffs' Post-Trial Memorandum at 115–16, could not have been known until after the negotiations were complete.

Plaintiffs also contend that the document transmitted to Congress failed to state the reasons for the difference between the action taken by the President and that recommended by the ITC. *See* Plaintiffs' Memorandum of Law on the Merits, filed March 16, 1978 at 79–83. The court fails to understand how plaintiffs can even make such a claim, since the first page of the President's message states six such reasons (D. Ex. J at 1).

As a corollary to their second claim with respect to the President's message to Congress, plaintiffs argue that Congress did not have sufficient time to review the OMAs, pursuant to § 203(c)(1), before they became effective. Suffice it to say that, as required by § 203(e)(1), import relief was proclaimed and took effect within 90 days from the date the President determined to negotiate the OMAs.[28] The President thus complied with the statutory procedures mandated by the Act.[29]

One further point must be made with respect to the insufficiency of the President's message to Congress alleged by plaintiffs. Except for plaintiffs' bald allegation that that message rendered Congress "incapable of exercising . . . its right to disapprove of the Presidential action as finally disclosed on June 24, 1977," Plaintiffs' Memorandum of Law on the Merits, filed March 16, 1978, at 82, there is nothing in the record to indicate that Congress felt

28. The President's determination was made on April 1, 1977. Import relief was proclaimed on June 22, 1977 (published in the Federal Register, vol. 42, No. 122, Friday, June 24, 1977) and took effect on June 28, 1977.

29. The court notes that pursuant to § 154(b) of the Act, 19 U.S.C. § 2194(b), the 90 days within which Congress could have passed a resolution of disapproval under § 203(c)(1), 19 U.S.C. § 2253(c)(1) did not include the days when either House was not in session because of an adjournment of more than three days to a day certain or an adjournment of Congress sine die and did not include Saturdays and Sundays. Therefore, according to the 1977 legislative calendar, Congress had until September 27, 1977 to disapprove the OMAs.

thwarted in its ability to review the President's action. Given the fact that the President complied with all statutory requirements relating to the transmittal of his message to Congress under § 203(b)(1) and the proclamation of import relief under § 203(e)(1), plaintiffs' allegation must be rejected. Therefore, the court finds that the President's message to Congress was sufficient to comply with both the language and the purpose of § 203(b)(1).

4. Plaintiffs also claim that the quantitative restrictions on imports effectuated by the OMAs are greater than the maximum amount permissible under § 203(d)(2) of the Act, 19 U.S.C. § 2253(d)(2). That section provides, in pertinent part, that any OMA "shall permit the importation of a quantity or value of the article which is not less than the quantity or value of such article imported into the United States during the most recent period *which the President determines is representative of imports of such article.*" (emphasis added). The President determined that the period 1974–1976 was the most representative period for imports of the type of footwear covered by the OMAs. *See* Presidential Proclamation 4510, June 22, 1977, Federal Register, vol. 42, No. 122, Friday, June 24, 1977 at 32431–2 (D. Ex. K, P. Ex. 1).

■ Plaintiffs disagree with the President's choice of 1974–1976 as the "most representative period." To dispose of plaintiffs' claim, the court need only note that the President's decision is not reviewable not only because it was specifically left to his discretion by Congress, but also because it goes to the substance of the agreements and as such is a political question which is beyond the scope of the remand from the Court of Appeals. *Sneaker Circus v. Carter, supra,* 566 F.2d at 402.

5. Plaintiffs' final challenge to the President's actions is that he violated § 202(c) of the Act, 19 U.S.C. § 2252(c), which sets forth nine specific factors which the President must take into account in determining the method and amount of import relief he will provide. Plaintiffs claim that the President failed to consider those factors before making his decision to negotiate the OMAs. That position is unsupported by the evidence.

■ First, in his proclamation announcing the consummation of the OMAs, the President specifically stated that he had taken account of the considerations specified in § 202(c) of the Act. *See* Presidential Proclamation 4510, Federal Register, vol. 42, No. 122, Friday, June 24, 1977 (P. Ex. 1, D. Ex. K). Since the President, like the members of his cabinet "[is] assumed to be [a man] of conscience," *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Schicke v. United States,* 346 F.Supp. 417, 421 (D.Conn.1972), *rev'd on other grounds,* 474 F.2d 309 (2 Cir. 1973), *on remand* 386 F.Supp. 97, D.C., *aff'd,* 507 F.2d 1389 (2 Cir. 1947), the court must assume that if the President said he considered the factors in § 202(c) then he in fact considered them. *See* Transcript at 1052–55.

However, the court need not rely solely on the President's statement in his proclamation in order to find that he complied with § 202(c). Shirley Ann Coffield[30] testified that as a member of an inter-agency task force formed to study non-rubber footwear, she participated in the preparation of a report on footwear (D. Ex. F) which was submitted to the Trade Policy Staff Committee, discussed by that Committee, and approved without recommendations. (Transcript at 982). As evidenced by the Table of Contents, that report contains a lengthy section which discusses each of the nine factors enumerated in § 202(c).[31] The

---

**30.** *See* note 26, *supra.*

**31.** Certain portions of the text of the report were expurgated by the government on the basis of privilege. The court reviewed those sections of the text and found that they were privileged since they comprised opinions and advice to the President (Transcript at 990).

Plaintiffs argued that they are entitled to know the facts and details of the information contained in the report (Transcript at 983, 984, 986, 993). However, that information goes to substance rather than procedure and as such plaintiffs are not entitled to it. *Sneaker Circus v. Carter, supra,* 566 F.2d at 402. Plaintiffs are

Trade Policy Staff Committee report was discussed with STR Strauss prior to his scheduled March 28 meeting with the President (Transcript at 982, 986), and STR Strauss then prepared a memorandum to the President on the subject of non-rubber footwear (D. Ex. G). That memorandum also contains a section which discusses the factors to be considered pursuant to § 202(c).[32] Ambassador Strauss submitted an affidavit stating that the nine factors listed in § 202(c) were discussed at a meeting with the President on March 28, 1977. Ambassador Strauss further stated in his affidavit that "[b]ased on the documents referred to in this affidavit and my discussions with the President, I have personal knowledge that the President considered all the factors set forth at 19 U.S.C. Sec. 2252(c) prior to determining whether to accept, reject or modify the relief recommended by the ITC . . . ."[33]

In addition to the Trade Policy Staff Committee Report (D. Ex. F) and the Memorandum from Ambassador Strauss (D. Ex. G), the President had before him twenty-nine other documents relating to the factors listed in § 202(c).[34] The government asserted a claim of privilege with respect to those documents, and after an *in camera* inspection the court upheld the claim with respect to most of them (Transcript at 1522 *et seq.*) The court did, however, make a statement that all of the documents inspected concerned the footwear industry and the various options open to the President (Transcript at 1565).

Finally, the reasons given by the President in his message to Congress (D. Ex. J) as to why his action differed from that recommended by the ITC made it clear that he had considered the factors enumerated in § 202(c) before making his determination to negotiate OMAs.

When the documentary evidence is considered together with the President's statement that he took account of the factors in § 202(c) and the fact that plaintiffs have adduced no evidence to show that the

---

entitled to know only whether the President had information before him pertaining to the factors listed in § 202(c). The only permissible inquiry in this case is whether the President considered those factors and not what specific information he had with respect to each of those factors.

**32.** The substance of that discussion was deleted from the exhibit on the basis of privilege. The claim of privilege was upheld by the court after *in camera* inspection of the deleted material. (Transcript at 1523).

**33.** Plaintiffs sought to call as a witness either Ambassador Strauss or someone else who was present at the March 28 meeting with the President (Transcript at 1596 *et seq.*). The defendants objected to the production of such a witness.

In *Wirtz v. Local 30, International Union of Operating Engineers,* 34 F.R.D. 13, 14 (S.D.N.Y. 1963), the court held that a member of the Cabinet should not be required to give testimony personally (there, by way of deposition) "unless a clear showing is made that such a proceeding is essential to prevent prejudice or injustice to the party who would require it." See also Schicke v. United States, 346 F.Supp. 417, 420–21 (D.Conn.1972), *rev'd on other grounds,* 474 F.2d 309 (2 Cir., 1973), *on remand* 386 F.Supp. 97, D.C. *aff'd,* 507 F.2d 1389 (2 Cir. 1974); *Peoples v. United States Department of Agriculture,* 427 F.2d 561, 567 (D.C.Cir., 1970).

Here, notwithstanding plaintiffs' protestations to the contrary, *see* Plaintiffs' Memorandum of Law on the Need for the Deposition of Stephen J. Lande or One With Knowledge of the Facts, there has been no clear showing of prejudice or injustice. Because the plaintiffs' inquiry is limited to the procedural issue of whether the President had information before him relevant to the nine factors listed in § 202(c), the only questions which the plaintiffs could ask any witness with knowledge of the facts would be: (1) did the President have documents before him relating to those factors? and (2) were those factors ever discussed with the President? No inquiry into the substance of the documents or conversations would be permissible, since such an inquiry would go beyond the challenge to procedures which plaintiffs are entitled to pursue. *See Sneaker Circus v. Carter, supra,* 566 F.2d at 402. Since the questions which plaintiffs could ask have been answered by documents made available to counsel and by the testimony of other witnesses it would be unnecessary for them to call STR Strauss or one of his deputies. *Cf. Wirtz v. Local 30, International Union of Operating Engineers, supra* at 14.

**34.** A list of those documents is attached to the affidavit of Robert J. Lipschutz in support of the claim of privilege made with respect to those documents.

President did not consider those factors,[35] the court can only conclude that the President did, in fact, comply with § 202(c) of the Act.

## C. Other Claims

■■■■■ Plaintiffs claim that the OMAs violate the "most favored nation" provisions of the Treaties of Friendship with Korea and Taiwan is without merit for several reasons. First, the treaties do not confer a private right of action for violation of their terms on nationals of one party within their own country. Thus, even assuming that the treaties do create a private right of action—which the court does not now decide—such right would pertain only to nationals of one party within the territory of the *other* party. *See, e. g.,* Treaty of Friendship, Commerce and Navigation with Korea, entered into force November 5, 1957, 8 U.S.T. 2217, TIAS No. 3947, Article I, Article II:1, Article III:1, Article IV:1, Article V:1, Article VI:1, Article VII:1, Article VIII:1, Article IX:1, Article X:1, Article XI:1. *See also* Treaty of Friendship, Commerce and Navigation with the Republic of China, entered into force November 30, 1948, 63 Stat. 1300, TIAS No. 1871, Article II:1, Article II:2, Article III:2, Article IV:1, Article VI:1, Article VIII:1.

■■■■ Moreover, even if the treaties do confer a private right of action on these plaintiffs, the treaties have not been violated since the quotas under the OMAs were *negotiated,* not imposed. *See* Treaty with Korea, Article XIV(2); Treaty with China Article XVI(3). Clearly, the United States, Korea and Taiwan had the authority to negotiate the agreements here and the plaintiffs' claim must therefore fail.

■■■■■ In addition, the Trade Act itself permits the President to act without regard to most-favored nation status, *see* 203(k)(*1*), 19 U.S.C. § 2253(k)(*1*), and specifi-

cally provides that the President may negotiate one or more OMAs. See §§ 203(b)(1), (e)(1), 19 U.S.C. §§ 2353(b)(1), (e)(1). Thus, the Act itself contemplates the consummation of agreements which might well discriminate against certain of our trade partners otherwise entitled to "most-favored nation" treatment and, to the extent that such provisions of the Act are inconsistent with the provisions of the Friendship Treaties, the provisions of the Act would apply since they were enacted subsequent to those treaties. *See Akins v. United States,* 551 F.2d 1222, 1229 (C.C.P.A.1977).

■■■■■ Plaintiffs' claim that the President's action violated the General Agreement on Tariff and Trade (GATT) entered into force January 1, 1948, 61 Stat. Parts 5 and 6, TIAS No. 1700, is likewise without merit, since Congress has never ratified GATT. *See United States v. Yoshida International, Inc.,* 526 F.2d 560, 575, n. 2 (C.C.P.A.1975). Moreover, even if GATT were applicable, it specifically provides for suspension of the obligations of the Agreement in the event that imports of a given product into any country cause or threaten serious injury to domestic producers of the same or competitive products. GATT, Article XIX:1a.[36] Article XIX:2 provides that when action is taken pursuant to Article XIX:1, the party taking such action shall give notice to the other contracting parties as far in advance as possible. The uncontradicted testimony here is that three such notifications were given (Transcript at 981). Therefore, the GATT provisions were complied with, and plaintiffs' claim to the contrary must be rejected.

■■■■■ Finally, plaintiffs argue that if the determination of good cause by the ITC and the actions by the President were without authority in the Trade Act, then that determination and those actions, and the OMAs resulting therefrom, are in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

---

**35.** Plaintiffs' argument in support of their claim that the President failed to consider the factors listed in § 202(c) is that if he had considered them he would not have decided to negotiate OMAs. *See* Transcript at 440–41. That argument, however, clearly goes to the weight given by the President to each of those factors and in as an area into which the court may not delve.

**36.** Note that the language of § 201(b)(1) of the Trade Act, 19 U.S.C. § 2251(b)(1) very closely tracks the language of this provision of GATT.

Since the court has already found that the actions of the ITC and the President were in conformity with the provisions of the Act, and since "where a restraint upon trade . . . is the result of valid governmental action . . . no violation of the [Sherman] Act can be made out," *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961), plaintiffs' claim is without merit.

V. *Conclusion*

In light of the foregoing, the court concludes that the plaintiffs have standing to sue, that the action is ripe for adjudication, and that jurisdiction is proper. The court further concludes that all actions by the ITC and the President which are reviewable were taken in conformity with the Trade Act. Accordingly, plaintiffs' demand for declaratory judgment and injunctive relief is denied in all respects.

So ordered.